UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE DOE 1, JANE DOE 2, JANE DOE
3, JANE DOE 4, JANE DOE 5, JANE
DOE 6, JANE DOE 7, JANE DOE 8,
JANE DOE 9, JANE DOE 10, and
JANE DOE 11.

Case No. 2:25-CV-10806
Hon. Mark A. Goldsmith

                    Plaintiffs,

vs.

MATTHEW WEISS; the REGENTS OF
THE UNIVERSITY OF MICHIGAN;
THE UNIVERSITY OF MICHIGAN;
KEFFER DEVELOPMENT SERVICES,
LLC, DOMENICO GRASSO, SANTA
J. ONO, MARK SCHLISSEL, WARDE
J. MANUEL, DOUG GNODTKE,
JAMES JOSEPH ("Jim") HARBAUGH,
RAVI PENDSE, SOL BERMANN, and
DEFENDANT JOHN DOES 10–50.

                    Defendants.

---

**PLAINTIFFS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT
AND JURY DEMAND**

---

1

> **RECORDS PRESERVATION NOTICE**
>
> Defendants are hereby notified to preserve during the pendency of this action all records and documents in all forms and formats relating to this case and to notify employees, agents, and contractors that they are required to take appropriate action to do the same.

Plaintiffs, JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4 JANE DOE 5, JANE DOE 6, JANE DOE 7, JANE DOE 8, JANE DOE 9, JANE DOE 10, and JANE DOE 11 ("Plaintiffs"), through the interim co-lead and executive committee attorneys appointed by Orders dated May 23, 2025 (ECF No. 58) and June 23, 2025 (ECF No. 72), for their First Consolidated Class Action Complaint against MATTHEW WEISS, the REGENTS OF THE UNIVERSITY OF MICHIGAN, the UNIVERSITY OF MICHIGAN, KEFFER DEVELOPMENT SERVICES, LLC, DOMENICO GRASSO, SANTA J. ONO, MARK SCHLISSEL, WARDE J. MANUEL, DOUG GNODTKE, JAMES JOSEPH ("Jim") HARBAUGH, RAVI PENDSE, SOL BERMANN, AND JOHN DOES 10–50, state:

## THE PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Jane Doe 1 was a student athlete at the University of Michigan between 2017 and 2023 and was a member of the Michigan Women's Soccer team.

2.      Plaintiff Jane Doe 1 is domiciled in Oakland County, Michigan, in the City of Northville.

2

3.     Plaintiff Jane Doe 2 was a student athlete at the University of Michigan between 2017 and 2021 and was a member of the Michigan Women's Softball team.

4.     Plaintiff Jane Doe 2 is domiciled in Barstow, California.

5.     Plaintiff Jane Doe 3 was a student athlete at Bemidji State University between 2016 and 2020 and was a student athlete at the University of Minnesota between 2020 and 2022 and was a member of the Women's Hockey team at both schools.

6.     Plaintiff Jane Doe 3 is domiciled in Eagan, Minnesota.

7.     Plaintiff Jane Doe 4 was a student athlete at the University of Michigan between 2017 and 2021 and was a member of the Michigan Women's Track and Field team.

8.     Plaintiff Jane Doe 4 is domiciled in Indianapolis, Indiana.

9.     Plaintiff Jane Doe 5 was a student athlete at the University of Michigan between 2012 and 2016 and was a member of the Michigan Women's Field Hockey team.

10.     Plaintiff Jane Doe 5 is domiciled in Greenwich, Connecticut.

11.     Plaintiff Jane Doe 6 was a student athlete at Mount Royal University between 2018 and 2019, Barry University between 2019 and 2022, and George Washington University between 2022 and 2023, and was a member of the Women's Soccer team of each of those schools.

3

12.     Plaintiff Jane Doe 6 is domiciled in New York City, New York.

13.     Plaintiff Jane Doe 7 was a student athlete at Plymouth University between 2017 and 2021 and was a member of the Women's Volleyball team.

14.     Plaintiff Jane Doe 7 is domiciled in Boston, Massachusetts.

15.     Plaintiff Jane Doe 8 was a student athlete at Plymouth University between 2018 and 2022 and was a member of the Women's Volleyball team.

16.     Plaintiff Jane Doe 8 is domiciled in South Burlington, Vermont.

17.     Plaintiff Jane Doe 9 was a student athlete at Grambling State University between 2015 and 2019 and was a member of the Women's Basketball team.

18.     Plaintiff Jane Doe 9 is domiciled in Little Rock, Arkansas.

19.     Plaintiff Jane Doe 10 was a student athlete at Radford University between 2010 and 2014 and was a member of the Women's Basketball team.

20.     Plaintiff Jane Doe 10 is domiciled in Henrico, Virgina.

21.     Plaintiff Jane Doe 11 was not a student athlete but attended High Point University and has been contacted by the Department of Justice four times based on the same reasons as by other members of the class.

22.     Plaintiff Jane Doe 11 is domiciled in Chicago, Illinois.

23.     The above identified Plaintiffs are referred to as "Plaintiffs" and bring this case both on behalf of themselves and the class they seek to represent.

4

24.    The Regents of the University of Michigan (the "<u>Regents</u>") is a body corporate, with the right to be sued, vested with the government of the university. Mich. Comp. Laws § 390.3 and § 390.4.

25.    The University of Michigan (the "<u>University</u>") is a public university organized and existing under the laws of the State of Michigan.

26.    The University received and receives state financial assistance and is therefore, among other reasons, subject to the laws of the State of Michigan, and the Michigan Constitution.

27.    The University received and receives federal financial assistance and is therefore, among other reasons, subject to the laws of the United States and the Constitution.

28.    Keffer Development Services, LLC ("<u>Keffer</u>") is a Pennsylvania limited liability company that has continuously and systematically done business in the State of Michigan through its direct providing of services to residents and entities within the State of Michigan for which it has been handsomely compensated and has therefore purposefully availed itself of protections of the laws of the State of Michigan.

29.    Keffer's misconduct and legal failures as detailed in this Complaint occurred specifically with respect to several Plaintiffs who reside in Michigan and while they resided in Michigan.

5

60453048.2

30.     Matthew Weiss is an individual who resides in Michigan.

31.     Defendant Domenico Grasso is the current Interim President of the University.

32.     On information and belief, Defendant Grasso was appointed in May of 2025, and continues in this capacity today. Defendant Grasso is an employee of the University, and his conduct was and is under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Grasso's actions and/or inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

33.     Defendant Santa J. Ono was at times relevant to this lawsuit the President of the University.

34.     On information and belief, Defendant Ono served as President of the University from October 2022 to May 2025. Defendant Ono was at relevant times an employee of the University and his conduct was under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Ono's actions and/or inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

35.     Defendant Mark Schlissel was at times relevant to this lawsuit the President of the University.

6

36.    On information and belief, Defendant Schlissel served as President of the University from July 2014 to January 2022. Defendant Schlissel was at relevant times an employee of the University and his conduct was under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Schlissel's actions and/or inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

37.    Defendant Warde J. Manuel is the Athletic Director at the University.

38.    On information and belief, Defendant Manuel has served as Athletic Director at the University since January 2016 and had supervisory authority over Weiss. Defendant Manuel is an employee of the University, and his conduct was and is under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Manuel's actions and/or inactions, occurred in Michigan, which is within the jurisdiction of this Court.

39.    Defendant Doug Gnodtke was at times relevant to this lawsuit the Executive Associate Athletic Director and Chief of Staff for University athletics.

40.    On information and belief, Defendant Gnodtke had supervisory authority over Defendant Weiss, and wrote the letter terminating Defendant Weiss's contract with the University. Defendant Gnodtke was at relevant times an employee

7

of the University and his conduct was under color of law and is considered state

action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving

rise to this lawsuit, including Defendant Gnodtke's actions and/or inactions,

occurred in Michigan, which is within the jurisdiction of this Court.

41.     Defendant James Joseph ("Jim") Harbaugh was the head football coach

at the University during the time period relevant to this action.

42.     On information and belief, Defendant Weiss worked directly for

Defendant Harbaugh, who had direct supervisory authority over Weiss.

43.     Defendant Harbaugh was at relevant times an employee of the

University and his conduct was under color of law and is considered state action

under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to

this lawsuit, including Defendant Harbaugh's actions and/or inactions, occurred in

Michigan, which is within the jurisdiction of this Court.

44.     Defendant Ravi Pendse is the Vice President for Information

Technology ("IT") and Chief Information Officer at the University.

45.     On information and belief, Defendant Pendse has served in this role

since 2018 and continues in this capacity today. Defendant Pendse is an employee

of the University, and his conduct is under color of law and is considered state action

under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to

8

this lawsuit, including Defendant Pendse's actions and/or inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

46. Defendant Sol Bermann is the Executive Director of Privacy & Faculty Affairs in the office of the Vice President for Information Technology and Chief Information Officer at the University.

47. On information and belief, Defendant Bermann served in this role at times relevant to this lawsuit. Defendant Bermann is an employee of the University, and his conduct is under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Bermann's actions and/or inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

48. The Plaintiffs and Class Members are ignorant of the true names and capacities of the Defendant Does 10-50, but believe them to be employees of the University, members of the Board of Regents, or otherwise involved in the events leading up to this action and/or are and/or have been part of the athletic program for which Weiss worked.

49. On information and belief, Defendant Does 10-50 ignored, aided, or otherwise assisted, enabled, and/or allowed Weiss to carry out his actions, which included accessing the student athlete databases, including the University's databases and systems. Plaintiffs will seek to amend this Consolidated Complaint to

9

set forth their true names and capacities when they are ascertained. Plaintiffs are informed and believe, and on that basis allege, that each of these fictitiously named defendants is responsible in some manner for the illegal, intentional, improper and/or discriminatory actions alleged herein, which were committed in Michigan, and which subject the fictitiously named defendants to the jurisdiction of this Court.

50.    Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1367 because this matter involves various federal causes of action including but not limited to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1981 *et seq.* ("Title IX") and the court has supplemental jurisdiction of the other causes of action under 28 U.S.C. §1367(a).

51.    Venue is appropriate in this district under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district and Defendants are subject to personal jurisdiction in this district.

## COMMON ALLEGATIONS

### A. Weiss accessed Plaintiffs' private information, and the University permitted him to coach despite notice that he did so.

52.    The University permitted Weiss to coach in the 2022 Fiesta Bowl despite knowing he had accessed private information of students, primarily female student athletes, while on University property and with University computers.

53.    Weiss was employed by the University from February 2021 through January 2023.

54.    Between December 21 and 23, 2022, an individual staff member saw Weiss viewing Plaintiffs' private information at Schembechler Hall.

55.    The information included personal identifying information ("PII") and private health information ("PHI").

56.    The individual knew Weiss was not supposed to access, or be able to access, the private information Weiss was viewing.

57.    The individual who saw Weiss reported it within the University.

58.    That report occurred prior to December 31, 2022.

59.    The University, the Regents, and the individual University employees Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann (the "Individual University Employees" or "Individual Defendants," and together with the University and the Regents, the "University Parties") know the identity of this individual but have withheld that person's identity from Plaintiffs.

60.    Weiss's access to Plaintiffs' private information between December 21 and 23, 2022 was also reported to the University Police Department.

61.    The Police Department also investigated Weiss's conduct.

62.    Weiss was ultimately fired for this conduct in late January 2023.

11

60453048.2

63.     But the University Football Team first played in the Fiesta Bowl on December 31, 2022.

64.     It did so with Weiss coaching.

65.     The University knowingly permitted Weiss to coach in the Fiesta Bowl on December 31, 2022, despite knowing that he had been seen accessing Plaintiffs' private information between December 21 and 23, 2022 at Schembechler Hall, and despite that his doing so was reported to the University prior to December 31, 2022.

66.     In this way, the University placed profits before people, particularly women and female student athletes.

67.     That decision and that action, and inaction, was a Title IX violation.

68.     It was also a violation of other statutes, and indicative of the factual basis for the various claims in this case.

69.     Weiss's access to Plaintiffs' private information was in furtherance of his job duties.

70.     Weiss also accessed Plaintiffs' information prior to December 21, 2022.

71.     On January 5, 2023, the University publicly but vaguely reported about Weiss's actions, see: https://www.dpss.umich.edu/content/crime-safety-data/daily-crime-fire-log/ and even then the reporting included scant details.

72.     The University crime log reads:

60453048.2

"1/05/2023 12:44 pm FRAUDULENT ACTIVITY CAD# 2300001507 SCHEMBECHLER GLENN E HALL1200 S STATE ST An employee reported fraudulent activity involving someone accessing university emails accounts without authorization. Upon further investigation, It was found that a crime may have been committed."

73.    No details have been provided.

74.    On January 10, 2023, federal, state, and local law enforcement officers executed search warrants at the University football program meeting facilities including the quarterbacks' meeting room and tight ends' meeting room, among other places. Electronic devices used by Weiss were seized from those locations.

75.    On January 17, 2023, the University placed Weiss on paid leave without public explanation.

76.    By letter dated January 20, 2023, signed by Gnodtke, the University fired Weiss.

77.    The January 20, 2023 termination letter indicated the reason Weiss was being fired was because Weiss failed to attend a meeting to discuss whether he had "inappropriately accessed" computer accounts belonging to other people.

78.    When asked, Manuel has said only that Weiss's termination was related to a "review of university policies."

79.    Manuel has not provided more information.

80. At no time did the University issue a Cleary Act notification related to Weiss's conduct.

81. Manuel has concealed the details about how private and intimate information of student athletes, overwhelmingly female student athletes, was accessed by a highly paid University athletic department employee from the very athletes he is paid with taxpayer dollars to protect and promote.

82. Manuel's actions show athletic success in the football program and avoiding bad publicity are more important than full transparency to female student athletes, none of whom play football.

**B. The University concealed Weiss's identity from students.**

83. By letter sent in March 2023, the University obscured Weiss's actions from students.

84. The University delivered notice to Plaintiffs and many in the class, stating that a "flaw" (the "Flaw") in their computer network had led to the compromising of private data. **Exhibit A**.

85. The letter describes itself as a "follow-up" to an "investigation" by the "University of Michigan Police Department." *Id.* at 1.

86. In the preamble, the letter offers to provide students "some additional information, as well as offer you identity theft protection coverage." *Id.*

14

87.     In the first section, titled "What happened," the University explains to select students that it "identified" "in late December 2022, potentially unauthorized activity in your U-M Google account." *Id.* As part of its "investigation," the University "discovered that a 'threat actor' manipulated a ***flaw*** in [the U-M Google account] self-service password-recovery to change your password and gain unauthorized access to your U-M Google account." *Id.* The letter defines the self-service recovery function as "<u>Forgot password</u>." *Id.*

88.     Plaintiffs did not know at that time that the "threat actor" was Weiss, then a high paid employee of the University.

89.     The identity of the "threat actor" was covered up by the University Parties.

90.     The letter specifies that the "University police" "subsequently launched a criminal investigation." *Id.*

91.     Based on its investigation, the University next states, the *Flaw* in Forgot password permitted the "threat actor" to "gain[] unauthorized access to some of your accounts and/or data." *Id.*

92.     While the University did not further identify or describe the Flaw, it explained that, because of the Flaw, the "threat actor" "also logged into your U-M account management settings, where 'they' may have viewed and/or changed your password recovery phone number and password recovery email address." *Id.*

93.     The University Parties provide scant details about what exactly they learned Weiss did, when he did it, who was affected, and how he did so, and what the investigation revealed as to Weiss's motive.

94.     In this way, no real information about the "investigation" was relayed and the University Parties merely perpetuated the harm.

95.     The University Parties also specifically concealed that female student athletes are the primary victims.

96.     Rather than identify Weiss, the letter states that "[a]dditionally, 'they' logged into your M+ Google email and/or Google Drive." *Id.*

97.     The letter confirms that PII *was* accessed. The letter states, "law enforcement investigations have determined 'they' [referring to the 'threat actor'] were able to use information in your account to access additional personal information, which may include access details for accounts inked to your U-M email address (online banking, social media, password management, etc.)" *Id.*

98.     In sum, while written in past tense and defensive in tone, the letter discloses without qualification that it was the University's technology *flaw* that permitted access without authorization to Plaintiffs' personal online banking, social media, and password management data.

99.   The letter concluded by acknowledging "how important your personal information is" and that the University "deeply regret[s] that this situation occurred." *Id.*

100.   Evidently, the University Parties did not regret the events deeply enough to provide the student athletes with the critical detail of *who* committed the acts, or tell Plaintiffs, who are predominantly female student athletes, the entire truth, including that the "threat actor" was University employee Weiss, but also that Weiss took these actions on a University computer, while at Schembechler Hall, and that women were the primary targets.

101.   Yet, the University also stated it "is committed to maintaining a secure computing environment, preserving the confidentiality of the information we maintain, and constantly reviewing and improving our security practice." *Id.*

102.   The University apologized "for any inconvenience this incident has caused you" and offered the email address privacy@umich.edu and a local phone number, with the phrase "Data Incident Notification Letter from Feb. 2023," as a resource to "talk to someone about this situation." *Id.*

103.   The letter was signed by Sol Bermann, the Chief Information Security Officer, Executive Director of Information Assurance for the University. *Id.*

104.   The University, along with Grasso, Ono, Schlissel, Manuel, Gnodtke,

17

Harbaugh, Pendse, and Bermann will not tell Plaintiffs or the class any details about what they know, even though those details are preventing Plaintiffs and the class from learning the entire nature of their harm, the causes, and likely means to prevent further harm. Among other missing details is that Plaintiffs have learned Weiss's University issued computer was equipped with non-University encryption software that had to be disabled by an external vendor to fully investigate the depth of the invasions committed.

## C. The Mega Victim Case Assistance Program (MCAP) confirms Plaintiffs are victims of Weiss and the University.

105.   The Department of Justice ("DOJ") has corroborated that Plaintiffs and the class are "victims."

106.   The DOJ said the victimization extends to aggravated identify theft, and includes "thousands of candid, intimate photographs and videos" with "many" including "victims engaged in explicit sexual acts."

107.   The specific details of methods taken to victimize Plaintiffs, when, through what medium, by who (all such actors), and what was taken, lost, and what can or will happen, however, are never provided.

108.   By emails dated on or about March 27, 2025, the DOJ contacted thousands of class members stating that each is a victim of the "incident" described in **Exhibit A**. *See* **Exhibit B**—name redacted. The emails state that the Plaintiffs and

18

the members of the class are each "a victim of unauthorized access and aggravated identity theft."

109.   The email states that "the defendant" (referring to Weiss as a highly paid University employee and while inside Schembechler Hall) "gained unauthorized access to the email, social media, and cloud storage accounts of 2000+ victims between 2015 and 2023." *Id.*

110.   The email states that "[t]housands of candid, intimate photographs and videos have been seized from the [criminal] defendant's electronic storage devices and his cloud storage accounts." *Id.* The email specifies that "[m]any" of the photographs and images "show victims naked" and that "[s]ome show victims engaged in explicit sexual acts." *Id.*

111.   The email indicates that there is an active FBI investigation ongoing.

112.   The email recommends resetting passwords across online accounts, especially those containing "sensitive information," including but not limited to financial accounts, email accounts, file storage accounts, and social media accounts. *Id.* The email strongly advises against reusing passwords and endorses "additional" levels of electronic authentication. Finally, the email offers resources for further identify theft information about safe practices. *Id.*

113.   Students and alumni from colleges and universities across the United States, including many connected to the University, have suffered a breach of their

privacy and other injuries because of the actions of Weiss, a former University football coach, and the actions and inactions of Keffer, Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann.

**D. Sexual misconduct at the University is longstanding and widespread.**

114.   The sexual misconduct of, and by, officials at the University, and the University's deliberate indifference to the same, runs the gamut. The University has a long, sad history of subverting the interests of its students and student-athletes to its own institutional and bureaucratic concerns. The culture of allowing and enabling sexual misconduct at the University is severe, pervasive, and objectively offensive. This culture of harassment constitutes a sexually hostile education environment. The University was on notice of these violations of Title IX and the pattern and culture of sexual harassment at the University. Some examples are outlined in the following paragraphs.

115.   For nearly thirty years, until the late-1990s, the University's athletic department employed Dr. Robert Anderson as its head medical doctor, who was alleged to have sexually assaulted and raped thousands of student victims, leading to a massive $490 million settlement that the University reached with the victims in 2022. According to the subsequent investigation, more than two dozen University officials knew about Anderson's behavior at the time it was occurring, including the University's former athletic director and head football coach.

20

116.   The extensive and public allegations of sexual harassment and abuse by the University's second highest administrator, Provost Martin Philbert, who was an employee at the University since 1995, further demonstrates the University's pervasive culture of misconduct and systemic indifference to the safety and well-being of the University community.

117.   According to the report of an independent investigation commissioned by the University, Philbert "made comments about women's bodies," exactly as Weiss did in his dossiers of the women he harassed. Report of Independent Investigation: Allegations of Sexual Misconduct by Martin A. Philbert, dated July 31, 2020, by the Wilmer-Hale Law Firm p. 1.[1]

118.   Also, according to the independent investigation Report, Philbert stored explicit photos of his victims on University-owned devices, exactly as Weiss did with his victims' photos. *Id.* at 2, 3. The sexual harassment Philbert perpetrated while he was at the University spanned a period of at least 15 years. *Id.* at 76.

119.   Provost Philbert was the highest ranking official to be accused of this type of misconduct – until the University learned that its President, Defendant Mark Schlissel, was also accused of sexual harassment.

---

[1] https://regents.umich.edu/files/meetings/01-01/Report_of_Independent_Investigation_WilmerHale.pdf (last visited on June 19, 2025).

60453048.2

120.   The Board of Regents voted unanimously to fire Defendant Schlissel.

121.   In their firing letter, the Board of Regents acknowledged their actual notice of the culture of sexual harassment and other improper conduct at the University. They declared that Defendant Schlissel's conduct was "particularly egregious" when "considering your knowledge of and involvement in addressing incidents of harassment by University of Michigan personnel, and your declared commitment to work to 'free' the University community of sexual harassment or other improper conduct." Letter_to_Dr_Schlissel, p.2., available at: https://regents.umich.edu/files/meetings/01-01/Letter_to_Dr._Schlissel.pdf     (last visited June 13, 2025).

122.   The letter refers to an email Schlissel sent to "the entire University of Michigan community" after the "actions of Martin Philbert," which email stated: "The highest priority for our regents and leadership team is to make our community safe for all. The regents have been stressing with campus leadership the importance of diminishing sexual harassment and misconduct for many years." *Id.* And, as the Board of Regents noted, Schlissel had "declared to the community that [his] leadership would 'determine what we need to do to address the fear of retaliation in our community and build a culture that does not accept misconduct or harassment at any level.'" *Id.* The letter was individually signed by all eight members of the Board

22

of Regents serving on the Board at the time, seven of whom still serve on the Board to this day.

123.   Incredibly, at the very time it was settling the Anderson lawsuit and paying the victims, the University learned of the latest allegations of sexual harassment by a high-ranking athletic official – this time by Weiss, then the University's offensive coordinator of its football team – yet did nothing to protect the affected students. The University has known that there had been a data breach of student athlete PII, including candid and intimate images since, at the very latest, December 21, 2022.

124.   Yet in a brazen display of deliberate indifference, the University put the interests of the University football team ahead of those of the victimized female students, further discriminating against the Plaintiffs and Class Members. The University could have, and should have, considering the long history of "sexual harassment and improper conduct" at the University, *id.*, removed the perpetrator of these outrageous acts on the day the University received notice of them. Instead, even though it knew Weiss was behind the breach of female student-athletes' personal, private and intimate images and information, it allowed Weiss to coach in the 2023 national championship semifinal at the Fiesta Bowl. Only after the game, on January 5, 2023, over two weeks after it received notice of Weiss's conduct, did the University even put the incident on its police blotter.

23

125.   The 2022 breach did not come to light until March 20, 2025, when the Government charged Defendant Weiss with a 24-count indictment. Even when the University eventually notified some of the affected female students of the 2022 breach, it minimized it and covered it up, vaguely blaming an anonymous "threat actor" who exploited a euphemistic "flaw" in the University's software system to obtain the students' personal information. The University never disclosed the full extent of the breach, never identified Weiss as the perpetrator, and never disclosed that it was its own failure to adopt basic measures to protect student privacy (and not some "flaw" in the system) that enabled the breach – until after the March, 2025 indictment.

126.   Between December 2022 and March 2025, the University failed to contact the majority of Plaintiffs and class members, depriving Plaintiffs and Class Members of the ability to begin to address the aftermath of this nefarious chapter in the sordid history of sexual harassment at the University.

127.   Due to the University's actions and inactions, Plaintiffs and Class Members were unable even to take remedial actions to mitigate the enormous damage done to them. Instead, the University allowed them to continue to be harmed. Plaintiffs and class members now know some details only because of the March, 2025 indictment that revealed to the victims for the first time, crucial but scant details of what had been done to them. To this day, the University has failed

24

and refused to disclose the details of Plaintiffs' and class members' victimization. These details are essential to Plaintiffs' and class members' ability to protect themselves.

128.   The women to this day continue to be victimized.

129.   In contrast, as noted above, the University provided the men on the football team the benefit of Weiss's football prowess as an elite offensive coordinator at their playoff game, 10 days after his victimization of women was reported to the University.

130.   At least two Plaintiffs notified the University, by contacting the University's IT Service Center – after receiving a notice from the IT department itself – that their email passwords were changed. On information and belief, other members of the class similarly contacted the University's IT Service Center.

131.   A review of the timeline reveals, not only that a culture of sexual harassment has thrived at the University for many years, but that the University has explicitly admitted knowledge of that incredibly dangerous culture as well.

132.   In 2020 the University fired its second highest administrator, Provost Philbert, for sexual harassment that had gone on at the University for at least 15 years.

133.   Also in 2020, there was a claim against University leadership for sexual assault in the case of *Lipian v. University of Michigan*, 453 F.Supp.3d 937

(E.D.Mich., 2020)[2] where the claimant student alleged that he was drugged and assaulted by music professor, David Daniels, who was placed on paid and had previously been the subject of claims of sexual misconduct.

134.   In 2022, the University entered a massive settlement with thousands of students who had been sexually harassed and assaulted, with the knowledge of more than two dozen University officials, by Dr. Robert Anderson, the head doctor of the athletic department.

135.   Also in 2022, at the very time the University was settling the Anderson lawsuit and paying the victims, it was investigating and firing its President for sexual harassment.

136.   In 2022, at the time it was firing its President for sexual harassment, the University acknowledged that the same President, Mark Schlissel, had warned and notified the Board of Trustees that there was a culture at the University of "sexual harassment or other improper conduct." Schlissel firing letter at 2. According to the Board of Trustees, this same President they fired for sexual harassment had earlier declared to them his commitment to "free" the University of its culture of sexual harassment. *Id.*

---

[2] https://www.detroitnews.com/story/news/local/michigan/2018/10/24/student-sues-university-michigan-and-professor-alleges-sex-assault/1752751002/

60453048.2

137.   Also in 2022, in the University's letter firing President Schlissel for sexual harassment, the Regents referenced the firing of Provost Philbert for sexual harassment two years earlier. In the Schlissel firing letter, the Regents admitted that it had been "stressing with campus leadership the importance of diminishing sexual harassment and misconduct for many years. *Id.*

138.   Even after those "many years" of notice of what the Regents described as "sexual harassment and misconduct" on campus; even after the 2020 firing of the Provost for sexual harassment; even after the 2022 firing of the President for sexual harassment; and even after settling the horrific Anderson sexual assault and sexual harassment allegations in 2022, for some of those same "many years" Weiss was sexually harassing women on campus right under the University's cognizant nose.

139.   Weiss's sexual harassment of his victims occurred in a context of control by the University. A substantial portion of Weiss's actions occurred on and with University property and were made possible by his access to University computers and/or data, including his indefensible and inexcusable access to Plaintiffs' and class members' private, sensitive and intimate information and images.

140.   Systemic, widespread harassment like that detailed above, in just a few of the many incidents of sexual harassment at the University, gives rise to Title IX liability.

27

141.   In *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 639 (citing the lower court in that case, citation omitted), the Supreme Court suggested near unanimity on this point, observing that "even the dissent suggests that Title IX liability may arise when a funding recipient remains indifferent to severe gender-based mistreatment played out on a "widespread level. . ." *Davis*, 526 U.S. at 653.

142.   In the context of student-on-student sexual harassment, the Sixth Circuit has adopted a four-part test for determining whether a school's deliberate indifference before the victim was harassed, caused the harassment: (1) A school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school. *Doe v. Government of Nashville & Davidson County*, No. 20-6228, p.7 (6th Cir. 2022).

143.   As detailed above and throughout this Consolidated Complaint, each of the four factors have been met in this case.

144.   Plaintiffs bring this action to force the University to account for its illegal, intentional, inexpiable and discriminatory treatment of their female student-

athletes at the hands of Weiss, whom the University enabled and protected until the Government's prosecution in March, 2025 forced its hand.

145.   Simply stated, the University has long known of a culture of sexual harassment at the University, and that Weiss obtained female student-athletes' intimate data, yet did nothing to protect its students. This conduct violates Title IX, which requires equivalent and fair treatment of female student-athletes and gives rise to additional claims based on the United States Constitution, the Michigan Constitution, common law, tort law, and federal privacy protection laws, all as outlined in this Consolidated Complaint.

**E. The University's deliberate carelessness of protecting student PII is also longstanding and widespread.**

146.   The University has had cybersecurity breaches before Weiss.

147.   In this case, it is undisputed that the University has known since at least December 2022 that there had been a significant data breach of student athlete PII, including candid and intimate images. Since that time, there have been other, repeat data security breaches at the University.

148.   The 2022 breach did not come to light until March 20, 2025. It was then that the Government charged Weiss with a 24-count indictment alleging 14 counts of unauthorized access to computers and 10 counts of aggravated identity theft.

29

60453048.2

149.   But in August 2023, hackers gained access to up to 230,000 individuals including the PII of University students and applicants, alumni and donors, employees and contractors, University Health Service and School of Dentistry patients, and research study participants.

150.   The University later informed these individuals about this breach and those whose information was likely stolen and offered free credit monitoring services.[3]

151.   In September 2024, Michigan Medicine had a *second* cyberattack in four months targeting employee email accounts and compromising protected health information, such as the names, medical record numbers and diagnostic and/or treatment information of nearly 58,000 people.[4]

152.   When these latter two major cybersecurity attacks occurred, the University Parties knew of the prior major security breach at issue here and knew so by at least December 2022.

153.   But for reasons that remain unknown, Plaintiff-victims were never told their student athlete information had been compromised. *Id.*

---

[3] *See* https://www.detroitnews.com/story/news/local/michigan/2023/10/23/um-3rd-party-accessed-school-systems-personal-information-for-5-days/71292044007/ (last visited on April 13, 2025).

[4] *See* https://www.freep.com/story/news/health/2024/09/26/cybersecurity-breach-university-of-michigan-medicine-email-attack/75392949007/ (last visited on April 13, 2025).

154.    Yet, between January 10 and February 2, 2023, the 15th District Court in Ann Arbor signed at least 14 search warrants, giving investigators permission to seize items from the home and office of Weiss, as well as the quarterback and tight end meeting rooms at Schembechler Hall and the campus Administrative Services Building.[5]

155.    The full extent of that data breach has never come to light and the extent that has did not come to light until March 2025 when the Government indicted Weiss.

156.    Again, in all this time, harm to Plaintiffs and the class members could have been avoided.

**F. The University's use of Keffer without insisting on more protection shows more carelessness for student health, safety, and privacy.**

157.    Keffer is a software company.

158.    Its flagship product, called the Athletic Trainer System ("ATS"), provides cloud-based electronic medical record software that Keffer sells to athletic programs as a service, charging schools and teams an annual fee for each user.

159.    Over 6,500 schools, clinics, and organizations throughout the United States use Keffer's ATS software platform.

---

[5] *See* https://www.detroitnews.com/story/news/local/michigan/2025/03/26/warrants-reveal-what-was-seized-from-ex-um-coach-weiss-home-office/82678503007/  (last visited on April 13, 2025).

160.   Keffer designed ATS to allow both coaches and team medical staff—often athletic trainers, hence the system's name—access to real-time data about student-athletes' health and readiness to compete.

161.   Keffer also designed ATS to spot health risks and cue coaches and medical staff to engage in preemptive mitigation.

162.   Coaches and athletic programs input, or direct athletes to input, athletes' data into the ATS system. These data include PII and PHI such as athletes' contact information, medical details like height, weight, blood type, and medical history.

163.   ATS also attempts to track athletes' mental health by providing online forms for athletes to input highly sensitive PII and PHI relating to anxiety, alcohol and drug use, insomnia, disordered eating, and depressive characteristics or feelings.

164.   These data are then transmitted to and stored by Keffer and made available to users for whom contracting universities, and other contracting entities, authorize access.

165.   ATS is an online platform accessible via web browser or an app that a coach can download to his or her smartphone or tablet. Users (i.e., coaches, athletic trainers, and student athletes) sign in to Keffer's ATS using a password set by the user.

32

166.   Keffer stores ATS data about student athletes on servers that the company advertises as being compliant with several leading data-security standards.

167.   On information and belief, ATS data are stored in servers located in multiple states.

168.   ATS users, including coaches, athletic trainers, doctors, and student-athletes, access that data by using an internet connection on their computer or smartphone, which transmit data across the network of interstate wires.

169.   Keffer keeps records of all operations and user transactions on ATS, called "transaction logs" and "user transaction logs."

170.   The former track operations related to athlete records like who viewed or modified a profile; the latter capture modifications to user accounts such as password changes and administrative profile updates.

171.   Those logs are maintained as part of ATS and are accessible to and monitored by Keffer.

172.   The University executed a contract with Keffer to give its Athletic Department employees, including coaches, access to student-athletes' medical information via ATS in or about 2008.

173.   Plaintiffs and class members entrusted that the University and the University Parties' authorization to and entrustment to Keffer would keep them safe and their private information private.

33

174.   Because ATS's functionality included facilitating communications between student-athletes and their trainers and coaches, each student-athlete in the system had an individual account the athlete could use to log into ATS's system. Each athlete's account had its own user ID and password, and the athletes had the ability to specify their preferred passwords.

175.   Likewise, university coaches, trainers, and athletic directors had their own individual accounts. Keffer referred to such non-athlete accounts as "staff" accounts.

176.   Keffer configured the ATS system so that athlete accounts only permitted access to the athlete's own data, while staff accounts permitted access to the data of multiple athletes – even multiple athletes across multiple schools.

177.   Keffer advertises the customizability of ATS in determining which staff members had access to which athletes' data. In Keffer's words, "[w]ith ATS you have the ability to set up users with a wide variety of security and usage options."

178.   Keffer hosts extraordinarily personal and sensitive PII and PHI of over two million athletes around the country. In addition, Keffer boasts numerous prestigious clients such as the University as clients.

179.   Yet, Keffer itself is a relatively small operation. Its customer-facing promotional and instructional materials are dated in design and content.

34

180.   For example, Keffer's website has a page devoted to information "About ATS," which on the Company History page includes a picture of a single-story home described as the basement where the company started:





Company History

Since 1994, Keffer Development Services—also known as The Athletic Trainer System (ATS)—has been at the forefront of custom software design and development.

What began in the basement of our family home has grown significantly over the years. In 1996, we relocated to downtown Grove City, PA, and in 2005, we built our own facility just outside of town.

181.   The same page invites users to "Meet the Team," and provides photographs and titles reflecting a staff of only five people, the majority of which are described as having a role at least partially involved in "sales":

35



**Ashley, ATC**

Sales & Support



**Joe, ATC**

Sales & Support



**Gail**

Research & Sales



**Dana**

Office Manager



**Rhett**

Founder/CEO

182.    Keffer's website also includes an "online help" section containing links to dozens of individual PDFs describing the operation of its system.[6]  Some of the links are broken and lead nowhere.[7]  Screen shots of the ATS system in the materials reveal outdated user-interface designs. For example:[8]

---

[6] https://www.athletictrainersystem.com/onlinehelp.aspx.

[7] *E.g.*, https://www.athletictrainersystem.com/pdf_files/Covid_temp_po_symp_Screen.pdf; https://www.athletictrainersystem.com/pdf_files/Covid_Test_Result_Import.zip

[8] https://www.athletictrainersystem.com/pdf_files/Configuring_UserAccount_ATS.pdf

36



183.   Keffer's own "help materials" reveal that its outdated appearance and relative lack of sophistication extended into the security of the student-athlete data hosted in its system.

184.   In particular, Keffer's system design included at least three flaws which made athletes' data and passwords susceptible to mass compromise.

185.   First, Keffer over-emphasized a focus on flexibility and customization of staff account permissions at the expense of reasonable and common-sense security. The result was that staff users could be granted access not just to athlete data of every member of a single team, or even all of the athletes at a particular school – but all of the athletes at multiple schools.  Indeed, Keffer's own instructional materials provide this "all athletes at multiple schools" staff member permission for

37

a "Head Athletic Trainer" as an example of a way to set up permissions, even

including a visual diagram of what such permissions look like:[9]



186.   Second, Keffer's system access provided mass access to, and export of,

student-athletes' passwords and related personal data (including birthdays)

associated with the athletes' own ATS accounts.

---

[9] https://www.athletictrainersystem.com/pdf_files/ATS_Security_Overview.pdf

187.   Keffer's user guide– described in a link as a guide to "Passwords and Athlete Security" that any member of the public can access on Keffer's website, illustrates that a staff member granted administrative permissions has access to built-in functionality to easily display the passwords of every athlete within that staff member's permission sphere:[10]



188.   Worse, that same "guide" tells everyone with access to the internet how to easily mass export all the names, birthdates, and passwords of athletes across multiple institutions in one file with a few clicks:

---

[10] https://www.athletictrainersystem.com/pdf_files/Athlete_Security.pdf

60453048.2

### Report of Athlete ID/Passwords:

These menu selections will give you a report based on which menu option you choose of the athlete ID/Passwords. This can help with beginning of year registrations when they forget their information.



189.    Third, despite Keffer designing its system to empower individual staff members to mass view and easily export highly-sensitive password and PII of student athletes across multiple institutions, Keffer's security measures surrounding the accounts of staff members with such extraordinary access were lax.

190.    Specifically, on information and belief, Keffer did not, prior to the incident at issue in this case, require multi-factor authentication for staff members to log in.[11]

---

[11] Keffer's user guides updated in April and May 2025 describe multifactor authentication as turned on by default for staff accounts, while guides describing the operation of the system prior to the Weiss incident say that multi-factor authentication was turned off by default and had to be enabled. *Compare* https://www.athletictrainersystem.com/pdf_files/Account_Authentication.pdf (revised April 2025 and describing MFA as turned on by default for staff accounts), *and* https://www.athletictrainersystem.com/pdf_Files/ATS%20Current%20Security%2 0Settings.pdf (updated May 2025, and stating MFA is required for staff and may not be                                    disabled,                                    *with*

40

191. Multi-factor authentication ("<u>MFA</u>") is a security enhancement that requires users to provide two or more verification methods to gain access to an account or system. MFA adds an extra layer of security beyond a username and password, making it significantly harder for unauthorized users to access accounts, even if one factor is compromised.

192. Thus, prior to the Weiss incident described here, anyone who obtained access to the password of a staff member with permission to view hundreds of thousands of passwords could log-in as that staff member.

193. Acting as a vendor for the University, Keffer agreed to safely maintain and store data concerning Plaintiffs and the class in a secure manner, free from improper access from employees of the University such as Weiss or third parties.

194. Keffer knowingly and intentionally took on the obligation to safeguard and protect the PII entrusted to Keffer by Plaintiffs and class members.

---

https://www.athletictrainersystem.com/pdf_files/2FactorAuthentication.pdf (to use MFA an administrator "must first turn this feature on in the Site Info area") *and* https://www.athletictrainersystem.com/pdf_files/Admin_FAQ.pdf.(describing MFA as an "option"), *and* https://www.athletictrainersystem.com/pdf_Files/ATS_FAQ.pdf (stating that "we have our own 2-factor authentication that *can be* enabled for staff and/or athletes/ Guardians (emphasis added)).

195.   Nevertheless, the system design decisions by Keffer were each unreasonable, unusual, and inadequate for a system hosting the volume and nature of sensitive personal information in Keffer's system.

196.   Individually and collectively, these security designs recklessly and negligently exposed the data of millions of student-athletes to being compromised by a single bad actor with a password.

197.   Keffer breached its obligations by failing to consider, enact, or implement appropriate policies, procedures, and security measures to safeguard and protect the personal and private information entrusted to Keffer by Plaintiffs and class members.

198.   The University student-athletes' data was stored in ATS (i.e., on Keffer's servers). The University and Keffer issued Weiss login credentials to access those data.

199.   As a senior member of the University's coaching staff, Weiss had privileged access to the ATS databases.

200.   On information and belief, the University is classified as an "umbrella organization" in ATS such that senior personnel at the University and athletic department can view data belonging to student-athletes across all of the University athletic programs. Upon information and belief, Weiss was granted this university-level privileged access on ATS by virtue of his senior role in the Athletic Department.

42

201.   Further, Keffer supplied Weiss with access to the ATS system that he would not have otherwise had. On information and belief, Keffer inadvertently and improperly granted Weiss further-elevated administrative access that allowed Weiss to view and download data pertaining to student athletes not attending the University, as well as the passwords of both University and non-University student athletes used to log in to ATS.

202.   Keffer was aware Weiss had been assigned an unusually high level of administrative access, which allowed him to access data and passwords for student-athletes from the University and other schools.

203.   Based on the foregoing, Keffer has harmed Plaintiffs and class members. Keffer knowingly and intentionally took on the obligation to safeguard and protect the personal, private, and intimate images and information entrusted to Keffer by Plaintiffs and class members.

204.   Keffer breached those obligations by failing to consider, enact, or implement any policy, procedure, or security measure to safeguard and protect the personal, private, and intimate images and information entrusted to Keffer by Plaintiffs and class members.

205.   Weiss accessed the personal, private, and intimate images and information entrusted to Keffer by Plaintiffs and class members as a result of

Keffer's failures to consider, enact, or implement any measure of security or protection.

206.   Weiss's access and activities on the system were recorded in Keffer's logs, including his downloading of student athletes' passwords.

**G. The University's Google Workspace Systems.**

207.   Google Workplace is a suite of cloud-based software made available to educational institutions, including the University, as a service by Google LLC (now a subsidiary of Alphabet Inc.).

208.   Google Workplace at the University includes email (i.e., access to students' and employees' University email addresses), calendar, and "drive" software services. All these services are cloud-based and operate using Google servers located in multiple states throughout the United States connected via the network of interstate wires.

209.   University students (including student athletes), faculty, and staff access Google Workspace and the data stored on Google servers via internet connection using their web browser or a mobile app.

210.   Google Drive and Google Photo (together, "<u>Google Drive</u>") are services available to University students, staff, and faculty. Both are cloud-based storage systems, which allow users to save documents, pictures, videos, and other

44

content in a personal file accessible only to the user (and those they specifically authorize to access individual files or folders within Drive).

211.   At all relevant times, University students, staff, and faculty members were required to sign in to the University's Google Workplace system, including Google Drive, using the University's "single sign-on" system.

212.   At all relevant times, the University's single sign-on system allowed a student, staff member, or faculty member to access virtually any University online system, including Google Workspace services, using a single unique username and password.

213.   Upon trying to access any Google Workplace service or page, a user would be redirected to a sign-on page hosted by the University. There, the user would be asked to submit his or her unique University username and password (i.e., his or her University single sign-on credentials). This data would be transmitted to University servers over an encrypted connection via interstate wires. If the username and password were correct, University servers would send a message back (again via interstate wires) to the service provider, Google, telling the service provider to grant the user access.

214.   At all relevant times, all University users' unique usernames matched the part of their email address before the "@" symbol. For instance, if a student had the email jdoe@umich.edu, her unique username was jdoe.

45

215.   The University's single sign-on system has a "forgot password" feature.

216.   Using that feature, a user clicks a link on the single sign-on page to initiate the password reset. Upon clicking the link, the person is prompted to enter his or her unique username. If he or she enters it correctly, the system redirects the user to a "verify identity" page. There, the person must enter either his or her birth date or eight-digit University identification number. If he or she enters either piece of information correctly, the system will take the user to a new page where he or she can obtain a code to unlock the account and change the user's single sign-on password.

217.   At all relevant times, the University did not require students, staff, or faculty to use MFA to access Google Workspace.

218.   Two-factor authentication or MFA adds a step to the sign-on process: after a user correctly enters his or her username and password, the sign-on system sends the user a one-time unique code via text (or a secure "authenticator" app) to his or her mobile phone. The user must then enter the code into the sign-on system within a limited time window before the system will grant the user access. MFA significantly increases security by requiring users to confirm attempted access via the users' mobile phones, a device likely to be in the user's possession and protected by additional passwords and/or biometric access protocols.

46

219.   The University's Google Workplace system, including Google Drive, remains accessible to and useable by students after they leave the University.[12]

220.   The University logs access and password-reset events related to the University's single sign-on system and the University's Google Workplace services, including Google Drive.

221.   The University requires organizational units that handle sensitive data to forward their security logs to the University's central information assurance office every 5 minutes. All other units must forward logs every 30 minutes for monitoring.

222.   On information and belief, the University did not treat either the Athletic Department or the IT unit that oversaw single sign-on and Google Workplace as offices that handled sensitive information.

223.   The University officer responsible for information assurance is the Vice President of Information Technology and Chief Technology Officer.

224.   Weiss was granted access to the University's single sign-on system Google Workplace when he began his employment at the University.

225.   He used the University's Google Workplace programs in the course of his employment by the Athletic Department, including to communicate with players

---

[12] Beginning in 2024, some former students' accounts may have been closed by the University if they had a very large amount of data 90 days after graduation and the former students took no action to reduce the amount of data stored. But most remain open and accessible in perpetuity.

47

and University personnel and to save documents related to the football program and his coaching activities.

226.   If Weiss did not work at the University, he would not have had access to the University's Google Workplace system or the University's single sign-on system.

227.   The University and the University Parties allowed Weiss to have unfettered Keffer data and unlimited Google Workplace system access for the University, all without enhanced verification such as MFA, and that conduct was extremely unreasonable, dangerous, enabled Weiss to access Plaintiffs' private PII, PHI, and intimate information.

## H. Unauthorized Access of Keffer's ATS and the University's Google Workspace

228.   While working at the University, Weiss obtained the private, protected data of roughly 150,000 unsuspecting students from across the United States.

229.   Weiss began by exploiting his elevated access to Keffer's ATS to obtain highly confidential information about students across the Athletic Department's many teams and across multiple universities. These data included PII and PHI like birthdates and parents' names; student athletes' height, weight, and race; and the passwords student athletes used to access ATS.

230.   Weiss used these data to target certain student athletes, mostly female student athletes, for further cyber harassment.

231.   Weiss used the data he obtained through his access to ATS to guess student-athletes' passwords (using information in the students' ATS data or their ATS password) needed to access Google Workplace or to successfully reset those passwords using students' usernames (which he knew from their email addresses) and birthdates or other PII (which he obtained from his ATS access), all of which was possible, or at least significantly more practicable, because of the lack of enhanced protection such as MFA.

232.   Once he had obtained or changed a student athlete's University single sign-on password, Weiss would log into and download data from the student's Google Drive. Weiss took documents and emails, including photographs and videos.

233.   For at least the duration of his employment by the University, Weiss sought out and obtained, among other things, the most intimate, private, personal photographs and information of student athletes—in particular, female student athletes—from their University Google Drive. These included nude and semi-nude photographs and videos.

234.   On information and belief, Weiss would view exceptionally private videos and photographs on his University computer via an internet connection and download such videos and photos to his University computer or other physical

49

storage medium. He would continue to access and view these images after obtaining them.

235.   On information and belief, Keffer was aware that Weiss had an inappropriately high level of administrative access to ATS and ATS's databases. Indeed, Weiss's access level was logged by Keffer's ATS when it was awarded and each time Weiss accessed ATS.

236.   Keffer took no action to correct or otherwise inhibit Weiss's access to the most sensitive student-athlete data that the company possessed.

237.   On information and belief, Keffer was also aware that Weiss had used his inappropriately high level of administrative access to download data concerning both the University and non-University students such as their birthdates and parents' names, height, weight, and race, and the passwords used to access ATS. Indeed, Weiss's actions to obtain these data were logged by Keffer's ATS.

238.   Keffer took no action to stop Weiss from obtaining these data and did not alert any student-athletes that their PII and PHI was or may have been compromised.

239.   On information and belief, the University, including but not limited to the Individual University Employees, were aware that Weiss had reset students' passwords, accessed students' Google Workplace accounts, and downloaded data from those accounts. Indeed, the University's own system logged these activities and

50

provided data assurance University personnel including but not limited to the University Individual Defendants with sufficient information to stop Weiss's activities.

240.   The University took no action to stop Weiss from obtaining these data and did not alert any student-athletes that their data was or may have been compromised by Weiss.

241.   The University began investigating Weiss in 2022 and reported Weiss in late 2022 for inappropriate and unauthorized access to computer systems.

242.   Despite commencing an investigation of Weiss in 2022, the University and separately each of the Individual University Employees permitted if not required Weiss to coach in the December 31, 2022 Fiesta Bowl.

**I. Each of the Named Plaintiffs have experienced specific harm from and as a result of conduct of each of the Individual Defendants.**

243.   Plaintiff Jane Doe 1 is a professional soccer player.

244.   Plaintiff Jane Doe 1 has been deprived of the use of her name, image, and likeness ("NIL") because of the actions and inactions of the Defendants as alleged in this Complaint.

245.   Plaintiff Jane Doe 2 has confirmed that she repeatedly had her PII, PHI, and NIL accessed and misappropriated because of the actions and inactions of the

51

Defendants as alleged in this Complaint, from and after Weiss was a University employee.

246.   Plaintiff Jane Doe 2 has and continues to receive constant updates that her PII, PHI, and NIL have been compromised and sold, since and after Weiss improperly accessed her PII, PHI, and NIL and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, and NIL.

247.   Plaintiff Jane Doe 3 has received at least four communications from the DOJ that her PII, PHI, NIL, and other personal information has been accessed and compromised in connection with Weiss's actions and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL and other personal information.

248.   Plaintiff Jane Doe 4 has and continues to receive constant updates that her email, social media, and cloud storage accounts were compromised, since and after Weiss improperly accessed them and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, and NIL.

249.   Plaintiff Jane Doe 5 had her email accessed by Weiss without authorization, and received notice of a suspicious log in, and immediately in late December 2022 contacted the University IT department and spoke with an individual with the last name Wright to ask about any information relating to the suspicious log in.

60453048.2

250.   Wright told Plaintiff Jane Doe 5 that there was nothing to worry about and that it was one of Doe 5's own software application that must have caused that log in attempt. Wright was wrong and Doe 5 continues to receive constant updates that her PII, PHI, NIL, and email, social media, and cloud storage accounts have been compromised, since and after Weiss improperly accessed them and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL, and her email, social media, and cloud storage accounts.

251.   Plaintiff Jane Doe 6 has received at least four communications from the DOJ that her PII, PHI, NIL, and other personal information has been accessed and compromised in connection with Weiss's actions and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL, and other personal information.

252.   Doe 6 has had her email, social media, and cloud storage accounts compromised by Weiss, and thereby damaged from the other Defendants' failure to take any reasonable action to safeguard her PII, PHI, NIL, and her email, social media, and cloud storage accounts.

253.   Plaintiff Jane Doe 7 has received detailed information from the DOJ that her and her partner's intimate information was accessed by Weiss.

254.   Plaintiff Doe 7 has been damaged because of each of the Defendants' actions and inactions and failures to take any reasonable action to safeguard her PII, PHI, NIL, and other personal information.

255.   Plaintiff Jane Doe 8 has received multiple DOJ communications that her PII, PHI, NIL, and other personal information was compromised and accessed by Weiss.

256.   In late 2022 and into 2023, Plaintiff Jane Doe 8 was contacted by University employees who instructed her to reset her email password.

257.   Doe 8 has had her email, social media, and cloud storage accounts compromised by Weiss, and thereby damaged by each of the Defendants' failure to take any reasonable action to safeguard her PII, PHI, NIL, and email, social media, and cloud storage accounts.

258.   Plaintiff Jane Doe 9, a non-University of Michigan athlete, has received at least four communications from the DOJ that her PII, PHI, NIL, and other personal information has been accessed and compromised in connection with Weiss's actions and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL, and other personal information.

259.   Plaintiff Doe 9 has had her email, social media, and cloud storage accounts compromised by Weiss, and thereby damaged by the other Defendants'

failure to take any reasonable action to safeguard her PII, PHI, NIL, and email, social media, and cloud storage accounts.

260.   Plaintiff Jane Doe 10 has received at least four communications from the DOJ that her PII, PHI, NIL, and other personal information has been accessed and compromised in connection with Weiss's actions and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL, and other personal information.

261.   Plaintiff Doe 10 has also received information from the University that her PII, PHI, and NIL was compromised.

262.   Plaintiff Doe 10 has received repeated information from Capital One and other credit card companies that her PII has been compromised and received those communications from and after December 2022.

263.   Plaintiff Doe 10 was thereby damaged by each of the Defendants' actions and inactions to reasonably safeguard her PII, PHI, and email, social media, and cloud storage accounts.

264.   Plaintiff Jane Doe 11 was never a collegiate student athlete but nevertheless has received at least four communications from the DOJ that her PII, PHI, and other personal information has been accessed and compromised in connection with Weiss's actions and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, and other personal information.

55

265.   Plaintiff Doe 11 has also received multiple DOJ communications that her other personal information was compromised and accessed by Weiss, including but not necessarily limited to her email, social media, and cloud storage accounts, and thereby she has been damaged by the other Defendants' failure to take any reasonable action to prevent harm to her including but not limited to because of actions by Weiss, and to otherwise safeguard her PII, PHI, and email, social media, and cloud storage accounts.

266.   Other non-named class members have reported up to five instances of identity theft after Weiss accessed her PII, PHI, and email, social mediation, and cloud storage accounts. On information and belief, many other class members have also had identity theft instances of this frequency after Weiss accessed their PII, PHI, and email, social media, and cloud storage accounts.

267.   Grasso has failed and refused to require the turnover of Plaintiffs' NIL taken by Weiss on behalf of the University Parties or to deliver to Plaintiffs the details of the University Police Department's investigation into Weiss's access to Plaintiffs' PII, PHI, and use of their NIL.

268.   Grasso thereby continues to perpetuate the harm to Plaintiffs and the class and is thereby inhibiting the Plaintiffs' ability to mitigate their damages.

269.   Beyond the President's office, Manuel, Gnodtke, Pendse, and Bermann each also failed and refused to require the turnover of Plaintiffs' NIL taken by Weiss

or deliver to Plaintiffs the details of the University Police Department's investigation into Weiss's access to Plaintiffs' PII, PHI, and use of their NIL.

270.   Manuel, Gnodtke, Pendse, and Bermann each thereby continues in this refusal and thereby to perpetuate the harm to Plaintiffs and the class and thereby is inhibiting the Plaintiffs' ability to mitigate their damages.

271.   Grasso, Ono, Schlissel, Manuel, Gnodtke, Pendse, and Bermann each failed and refused undertake basic security measures as to Weiss and the football program that are and were applicable to other portions of the University's athletic department, including the female teams. The refusal and failure by each of them separately to do so not only resulted in Weiss being able to equip his University computer with encryption, but in Weiss having the ability to access and benefit from Plaintiffs' PII, PHI, and NIL.

272.   Harbaugh failed and refused to require the turnover of Plaintiffs' NIL taken by Weiss or deliver to Plaintiffs the details of the University Police Department's investigation into Weiss's access to Plaintiffs' PII, PHI, and use of their NIL.

273.   Harbaugh led and encouraged a culture within the football program that resulted in a complete lack of oversight or protection for non-football student athletes.

274.   As the head football coach, Harbaugh was Weiss's direct supervisor. Harbaugh reported to the Director of the Athletic Department, who in turn reported to the President of the University, who in turn reports to the Regents.

275.   Harbaugh failed and refused to implement basic security measures as to Weiss and the football program that resulted in Weiss and others accessing Plaintiffs' PII, PHI, and NIL.

276.   Had Harbaugh implemented basic oversight of his staff, Plaintiffs and the class would have been protected against predators such as Weiss. Instead, Weiss was a highly compensated asset that was promoted by and within the football program, from which position he was able to, and did, target female student athletes, access and take their PII, PHI, and NIL, and cause years and years of fear, loss of the same educational opportunities as male student athletes, identity theft, loss of trust, and distrust in collegiate and professional athletics.

277.   Harbaugh himself has admitted he failed to reasonably monitor and supervise his staff.

278.   Those failures damaged Plaintiffs.

279.   Weiss violated Plaintiffs' and the class members' rights including but not limited to their rights to privacy and he was able to do so because of the other Defendants' gross institutional security failures.

280.   During his time at the University, Weiss served as quarterbacks coach and co-offensive coordinator for the football team. Immediately prior to the University, the Baltimore Ravens ("Ravens") of the National Football League employed Weiss—starting in 2009—in various coaching roles, during which time Weiss worked for Harbaugh's brother, John Harbaugh, who is the head coach of the Ravens.

281.   Weiss worked for John Harbaugh from 2009-2021 as an assistant coach, including two years as John Harbaugh's personal assistant, until Jim Harbaugh hired Weiss in February 2021 as the University's quarterbacks coach. Jim Harbaugh knew Weiss well, having previously worked with Weiss at Stanford University from 2005 to 2008.

## J. The Regents and the University also have been indifferent to harm to Plaintiffs and the class.

282.   The Regents are responsible and had a duty to ensure that the University be run with integrity and care for the students.

283.   It breached that duty by failing to supervise and monitor Weiss and as a result Plaintiffs and thousands class members have had their privacy illegally invaded.

59

284.   The Regents are also responsible for overseeing the University's operations, finances, and policy, including approving budgets, tuition rates, and construction projects.

285.   The Regents also failed in that duty by failing to consider, implement, or follow a policy to oversee how or whether the University conducted its operations in a manner that would have in any manner monitored, supervised, and ensured that retention and employment of Weiss would not result in a breach of the privacy Plaintiffs entrusted to the University.

286.   The Regents also failed to take any action much less consider means by which to prevent the harm caused to Plaintiffs and class members as alleged in this Complaint.

287.   The Regents were supposed, but failed, to establish University policy, including to monitor personnel, including but not limited to Weiss, so that students on the campus were protected from their privacy being invaded.

288.   The Regents were required but failed to ensure that the University offered services such as to have student athletes able to be treated by athletic professionals who do not invade their privacy.

289.   The Regents recklessly failed to ensure information of and pertaining to student athletes, including but not limited to Plaintiffs, was safely secured since Plaintiffs and other similar to them entrusted the Regents to do so.

60

290.   The Regents were responsible for financial oversight of the University but failed to prudently exercise that duty because they placed avoiding cost of learning, having, and implementing security measures to protect the personal, private, and intimate images and information of the Plaintiffs and others similar to them, as more important than incurring the cost of establishing and paying for programs to so implement safety policies, and to monitor and ensure student safety.

291.   The Regents are supposed to regulate all three U-M campuses but failed to do so by failing to consider or implement any policies to review, discover, or prevent the willful invasions of privacy committed by Weiss as a result of the access the University provided to him.

292.   The University itself had all of the same duties as the Regents.

293.   The University itself breached all of the same duties and in the same and/or similar manners as the Regents.

294.   The Plaintiffs and others like them entrusted the University to safeguard their bodily images and information.

295.   The University breached the heightened duty it had and recklessly permitted Weiss to invade the Plaintiffs' privacy and likewise for their student athlete peers and expose them and their intimate images.

296.   The University employed Weiss.

297.   The University controlled Weiss.

298.   The University assigned and directed job duties to and upon Weiss.

299.   Those job duties and direction directly resulted in Weiss accessing private, personal, intimate images and information of Plaintiffs and others similar to them, all of which were private, and entrusted to be safeguarded by the University and its agents.

300.   The University took no action to monitor Weiss despite providing him with the ability and means to invade Plaintiffs' privacy and the privacy of others.

301.   The University breached the confidences that Plaintiffs and others similar to Plaintiffs who entrusted to the University and did so by providing Weiss with the electronic credentials and ability to track and spy on students athletes including Plaintiffs, and to use those credentials to invade Plaintiffs' private lives and obtain and use images of them and personal information relating to them.

302.   With no University supervision, and during execution of his official duties as an employee of the University, Weiss invaded Plaintiffs' privacy and the privacy of others in similar postures.

303.   Hundreds if not thousands of students still face harm because, despite notice from decades of athlete department complaints and abuse, and widely known social media stockpiles of information that beg for safekeeping, the Defendants have failed again and again to disclose the harm Plaintiffs suffered, will continue to suffer, or how or where their private and personal information that was taken has been

62

disbursed, or is being stored, and maintained, and who can access such information, and from where.

304.   None of the Defendants has explained or justified why they failed to undertake any review of the conduct of Keffer or Weiss or otherwise failed to investigate the access at issue or monitor that access or establish safeguards for Plaintiffs and the class.

305.   The harm extends to accounts of more than 2,000 targeted athletes including but not limited to Plaintiffs and more than 1,300 additional students and/or alumni from universities and colleges from around the country.

306.   The harms at issue include but are not limited to enabling access to information that in the modern world is reasonably expected to be kept private, would be embarrassing if accessed by third parties, and is the kind of data every commercial and governmental actor is expected to take action to safeguard, particularly since the young student athletes entrust these exact Defendants to keep all such private information confidential and free from access by third parties.

307.   Despite all such notice and prior instances of breach of trust, the Defendants failed to protect Plaintiffs' private information and images, or to undertake any reasonable method to protect the Plaintiffs' privacy and the privacy of others.

60453048.2

## <u>CLASS ALLEGATIONS</u>

308.   Plaintiffs bring this lawsuit individually and as a class action on behalf of all others similarly situated pursuant to Rule 23.

309.   This action satisfies the numerosity, commonality, predominance, typicality, and adequacy elements of the rule.

310.   The Class is currently defined as:

**All persons whose personal information, images, data, social media, or videos were access by Weiss without authorization (the "<u>Class Members</u>").**

311.   Numerosity: Although the exact number of Class Members is uncertain at this time and can only be ascertained through forthcoming appropriate discovery, the number is great enough such that joinder is impracticable and is estimated to exceed three thousand members (3,000).

312.   Law enforcement officials have disclosed the numbers of victims is a great many and numerosity is established.

313.   The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court, and preserve resources, avoid potentially inconsistent results, and be an equitable and efficient manner to adjudicate the claims.

64

314. The Class Members are readily identifiable from information and records in the possession of the federal and state authorities, the Regents, the University, and Keffer.

315. The electronic records possessed by the Parties which conducted their own investigations can confirm the identification of class membership, and/or any subclasses necessary or appropriate.

316. Commonality: The facts and liability proofs show how, where, who, when, and through what mediums the invasions of Plaintiffs' information occurred and are best and fairly determined in one stroke.

317. The actions, inactions, and recklessness of the Defendants are common as to all Plaintiffs and Class Members.

318. The access and invasions by Weiss through unsecure facilities is common to all Class Members and has caused injury to the Plaintiffs and Class Members in virtually identical manners.

319. The vast majority of the factual proofs and questions of law common to the Plaintiffs and to the Class Members predominate over individual questions.

320. Plaintiffs' claims are typical of the Class Members because they are highly similar, share the same essential characteristics, and are related in time, space, and origin.

65

321.   Plaintiffs have each been closely vetted and are more than adequate representatives of the class because they experienced the harms that the Class Members experienced, are familiar with the facts, are motivated to seek justice, and adequately represent the harms perpetrated upon the class as a whole.

322.   Maintaining this action as a class action is superior to other methods of adjudication, promoting the convenient administration of justice because:

a.  The pursuit of separate actions by individual Class Members would risk inconsistent or varying adjudications that would confront Defendants with potentially incompatible standards of conduct;

b.  Many victims will not come forward without a certified class.

c.  Final equitable relief will be appropriate with respect to the Class for any monitoring, protection, therapy and other equitable forms of relief that may be provided;

d.  This action is manageable as a class action and would be unmanageable any other way;

e.  Absent the class action, individual Class Members may not know if their rights have been violated, if their PII, PHI, or NIL was taken; where such data are currently being stored or are accessible by others; and their injuries are likely to go unaddressed and unremedied; and,

60453048.2

    f.  Individual Class Members may not have a significant interest in

controlling the prosecution of separate actions.

**COUNT I – VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a) *Et Seq.***
**SEXUAL HARASSMENT AND ASSAULT**
**(AGAINST THE UNIVERSITY)**

323.   Plaintiffs incorporate the allegations set forth above by reference with

the same force and effect as if fully repeated.

324.   Title IX enacted in 1972, provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded
> from participation in, be denied the benefits of, or be subjected to
> discrimination under any education program or activity receiving
> Federal financial assistance[.]

20 U.S.C. § 1681(a).

325.   Plaintiffs and Class Members are each a "person" under the Title IX

statutory language at 20 U.S.C. § 1681(a).

326.   Since the passage of Title IX, the University of Michigan has received

and continues to receive federal financial assistance for its education program and is

therefore subject to the provisions of Title IX.

327.   The United States Supreme Court has acknowledged the principle that

the governing Board of an educational institution "is a recipient of federal education

funding for Title IX purposes." *Davis* v. *Monroe County Bd. of Ed.*, 526 U.S. 629,

639 (citing the lower court in that case, citation omitted). Thus, for purposes of Title

67

IX, the actions and/or inactions of the Board of Trustees are deemed the actions and/or inactions of the University.

328.    The Civil Rights Restoration Act of 1987 made Congress' intent plain that "program or activity," as used in Title IX, applies to any program or activity so long as any part of the public institution receives federal financial assistance. 20 U.S.C. § 1687. Thus, the University is subject to Title IX even if none of the funding for either its men's or women's athletic programs, or any other specific program, comes specifically from federal sources.

329.    In 1975, the Department of Health, Education, and Welfare (the predecessor of the United States Department of Education ("DOE")) adopted regulations interpreting Title IX. These regulations are codified at 34 C.F.R. Part 106 (the "Regulations").

330.    Among the ten factors specified in 34 C.F.R. § 106.41(c) that are to be considered in the determination of equal athletic opportunity at an education institution is the "[p]rovision of medical and training facilities and services."

331.    In 1979, the office of Civil Rights of the Department of Education ("OCR") issued a policy interpretation of Title IX and the Regulations. This policy interpretation is found at 44 Fed. Reg. 71413 (1979) (the "Policy Interpretation").

332.    The Policy Interpretation provides that, in order to comply with Title IX and 34 C.F.R. § 106.41(c), educational institutions must provide equal athletic

opportunities in three general areas, including "treatment and benefits." 44 Fed. Reg. at 71414.

333.   Under both the Regulations and the Policy Interpretation, compliance in the area of equal treatment and benefits is assessed based on an overall comparison of the male and female athletic programs, including an analysis of the factors listed in 34 C.F.R. 106.41, and an analysis of whether the necessary funds are provided for teams of both sexes. *Id.*

334.   The Regulations require that sponsors of interscholastic and other school-sponsored athletics (such as the University of Michigan) take such remedial actions as are necessary to overcome the effects of gender discrimination in violation of Title IX. *See* 34 C.F.R. § 106.3(c). On information and belief, any remedial actions which the University has taken have been insufficient to satisfy the University's obligations under Title IX.

335.   The Regulations further provide that, in order to comply with Title IX, "[a] recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent." 34 C.F.R. § 106.44. "Sexual harassment means conduct on the basis of sex that satisfies one or more of the following:"

(1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;

(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or

(3) "Sexual assault" as defined in 20 U.S.C. 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. 12291(a)(10), "domestic violence" as defined in 34 U.S.C. 12291(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a)(30).

34 C.F.R. § 106.30(a) (2020).

336.  20 U.S.C. 1092(f)(6)(A)(v) defines "sexual assault" as "an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation." Sexual assault under that definition is "[a]ny sexual act directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent," 34 C.F.R. Pt. 668, Subpt. D, App. A, and includes all "[o]ffenses against chastity, common decency, morals and the like" and also includes "[a]ttempts."[13]

337.  34 U.S.C. 12291(a)(36) defines "stalking" as:

> engaging in a course of conduct directed at a specific person that would cause a reasonable person to—
>
> (A) fear for his or her safety or the safety of others; or
>
> (B) suffer substantial emotional distress.

---

[13] *FBI – Offense Definitions*, FBI.GOV, https://ucr.fbi.gov/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/offense-definitions (last visited June 8, 2025).

338.   Stalking is a particular form of sexual harassment to which Plaintiffs and Class Members were subjected. Defendant Weiss wrongfully stalked his victims for years. The method by which he obtained Plaintiffs' and Class Members' information is objectionable to a reasonable person and speaks to the enormity of his stalking efforts. On information and belief, Weiss obtained Plaintiffs' and Class Members' information in the course of his employment with the University, by gaining access to the databases of more than 100 colleges and universities that were maintained by Defendant Keffer. Weiss then accessed personal information and medical data of more than 150,000 athletes. On information and belief, Weiss obtained his victims' passwords, assisted by research that he did on the internet. With these passwords, Weiss obtained access to social media, email, and cloud storage accounts of more than 2,000 athletes as well as more than 1,300 students or alumni from schools across the country. Weiss primarily targeted female college athletes. He researched and targeted these women based on their school affiliation, athletic history, and physical characteristics. Through his stalking, he obtained private photographs and videos never intended to be shared by their owners with anyone but their intimate partners.

339.   The damage caused by Weiss's stalking is, in a word, immense. His actions have caused his victims severe emotional distress in the form of humiliation,

71

embarrassment, loss of experience, loss of dignity and a profound sense of vulnerability that accompanies the exposure of deeply private matters.

340.   The Regulations further require that sponsors of athletics comply with the Regulations within three years of their effective date (which was July 21, 1975). Now, more than 49 years later, the University has still not fully complied with Title IX.

341.   As detailed above, the University had notice of the Title IX violations that are set out in this Count.

342.   Under Title IX, the University is obligated to promptly investigate and respond to allegations of sexual harassment, including Weiss' misconduct, in a manner that is not deliberately indifferent. 34 C.F.R. § 106.44.

343.   The University's failure to investigate and to respond promptly when Weiss's sexual harassment was reported to the University, constitutes deliberate indifference to discrimination on the basis of sex, in violation of Title IX.

344.   The University maintained a policy and/or practice of deliberate indifference to the protection of female student athletes, including Plaintiffs and Class Members.

345.   The United States Supreme Court has equated deliberate indifference with intentionality, stating that "a recipient intentionally violates Title IX, and is

subject to a private damages action, where the recipient is deliberately indifferent to known acts of teacher-student discrimination." *Davis*, 526 U.S. at 643.

346.   The University's conduct was intentional, as it acted with deliberate indifference to Plaintiffs' rights, both before and after Weiss's harassment, by:

    a.   Failing to protect Plaintiffs and Class Members in accordance with Title IX requirements;

    b.   Failing to adequately institute safeguards and protective measures to prevent Weiss from harassing students and invading their privacy;

    c.   Failing to properly investigate the discriminatory sexual harassment perpetrated by Weiss;

    d.   Failing to notify Plaintiffs and Class Members, and/or address complaints regarding the deeply private information Plaintiffs and Class Members entrusted to them;

    e.   Failing to institute corrective measures to prevent Weiss from engaging in further sexual harassment of students; and

    f.   Failing to adequately investigate additional acts of deliberate indifference.

347.   The University's deliberate indifference substantially increased the likelihood that Plaintiffs and Class Members would be sexually harassed.

348.   The prior instances of conduct in violation of Title IX outlined above demonstrate that the University ignored a history of sexual harassment, sexual abuse, and sexual assault at the University. The University's long, sordid history of Title IX violations and sexual harassment constitute prior instances of "conduct

73

demonstrating that [the defendant] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012).

349.   The United States Supreme Court has held that the failure to train itself can amount to deliberate indifference. *City of Canton, Ohio v. Harris* 489 U.S. 378, 388 (1989). As explained by the *Davis* Court, "the theory in *Gebser* was that the recipient is *directly* liable for its deliberate indifference to discrimination." *Davis,* 526 U.S. at 645 (emphasis supplied).

350.   The University also demonstrated its deliberate indifference, both before and after Weiss's sexual harassment, by failing and refusing to adequately train and supervise its employees, agents, and/or representatives, including Weiss, regarding the following duties:

   a. Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

   b. Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

   c. Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

   d. Investigating any and all privacy invasions committed by Weiss;

   e. Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

74

      f.  Maintaining a campus environment free from sexual harassment and invasions of privacy; and

      g.  Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

351.  The University's failure and refusal to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss's conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

352.  The University knew of the long-standing culture of sexual harassment at the University, ignored that history of abuse, and was clearly on notice that its training and supervision in this area was deficient and likely to cause injury. *See Marcilis*, 693 F.3d at 605.

353.  The University's failure to promptly and appropriately protect, investigate, remedy, and respond to the sexual harassment of Plaintiffs and Class Members was clearly unreasonable given the known circumstances. This failure constitutes deliberate indifference.

354.  Weiss's harassment, which on information and belief affected over 150,000 student-athletes and primarily targeted female college athletes, was sufficiently severe or pervasive such that it created a sexually hostile, intimidating, offensive and abusive environment at the University.

355.  The University's failure to promptly and appropriately investigate, remedy, and respond to the discrimination of Plaintiffs and Class Members, and

protect them and their PII, has effectively denied them equal educational opportunities at the University. 34 C.F.R. § 106.41(c).

356.   The Regulations explain how sexual harassment can result in an effective denial of access to the University's education program: "[s]exual harassment means . . . [u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that **it effectively denies a person equal access to the recipient's education program or activity**. . ." 34 C.F.R. § 106.30(a) (2020) (emphasis added).

357.   The United States Supreme Court has adopted this approach, holding that a violation of Title IX is shown where a Plaintiff establishes "sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651.

358.   Such denied access need not be physical. "It is not necessary, however, to show physical exclusion to demonstrate that students have been deprived by the actions of another student or students of an educational opportunity on the basis of sex." *Davis,* 526 U.S. at 651 (1999).

359.   As a direct and foreseeable result of Weiss' cyber sexual harassment, sexual assault, and/or stalking, and the deliberate indifference shown by the

76

University, Plaintiffs and Class Members have suffered a loss of educational benefits and opportunities, as well as deterioration and diminution in value of their NIL rights.

360.   "The right of publicity is a creature of state common law and statute and originated as part of the common-law right of privacy." *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 622 (6th Cir. 2000).

361.   As "Michigan has recognized a general right to publicity," NIL rights are a commercial asset protected under Michigan common law. *Romantics v Activision Pub, Inc*, 574 F Supp 2d 758, 764 (ED Mich, 2008).

362.   Michigan has also recognized the inherent value of student-athletes' NIL rights, and to that end has passed an act "to prohibit postsecondary educational institutions in this state and certain athletic organizations from preventing a college athlete from receiving compensation for the use of his or her name, image, or likeness rights." MCL Ch. 390.1731 *et seq.*

363.   Plaintiffs and Class Members generally, but particularly as high-level collegiate athletes, possess a legally recognized right to control and monetize their NIL rights, which rights are protected by Michigan NIL statutes and common law.

364.   Weiss' sexualized exploitation of Plaintiffs' and Class Members' private images – obtained without consent through cyber intrusion – directly impaired those rights. Weiss' actions damaged the integrity, marketability, and future value of

77

Plaintiffs' and Class Members' NIL assets. Any reputation damage, particularly when linked to nonconsensual exposure, directly diminishes a person's ability to control and profit from their NIL rights going forward.

365.   The concept of NIL rights is not new – it has been used by entertainers and celebrities for years to legally protect their "brand." It has been applied to athletes relatively recently, but recency bias aside, it is not restricted to athletes or for that matter, purely athletic endeavors. NIL embodies an individual's right to contract and profit from his or her name, image, and likeness in a commercial context. It also embodies the protection of a person's right to be left alone – to *not* have his or her name, image, and likeness released for public consumption and/or monetized or commercialized. In essence, NIL represents one's brand. That brand holds value not only throughout a person's life, but in fact in perpetuity. It not only survives graduation from any college, it literally and legally survives death.

366.   The nonconsensual access and/or exposure of Plaintiffs' and Class Members' sensitive and intimate photographs and information has irreparably tainted Plaintiffs' and Class Members' personal brands. In today's collegiate sports environment, NIL value is inextricably linked to an athlete's public image, marketability, and perceived integrity. The reputational harm caused by Weiss's conduct, combined with the University's deliberate indifference to cybersecurity risks, prior red flags and an institutional culture of systemic "sexual harassment" and

78

"other improper conduct" (Schlissel firing letter, p.2.) as detailed above, has materially diminished Plaintiffs' and Class Members' ability to obtain endorsements, sign with sponsors, obtain and/or retain employment, or otherwise commercially benefit from their NIL and athletic status, particularly because of Plaintiffs' and Class Members' gender.

367.   Moreover, the University's failure to act in a timely and protective manner - despite being on notice of Weiss' misconduct and the broader risks to female athletes' digital privacy - constitutes a knowing failure to prevent, and a deliberate indifference to, sex-based discrimination at the University. This failure enabled an environment in which female student-athletes were uniquely vulnerable to sexualized exploitation precisely because of their gender, athletic status, and online visibility. Plaintiffs and Class Members are entitled to damages for the long-term commercial harm to their NIL value – a measurable loss flowing directly from Defendants' discriminatory conduct, acts of commission and/or omission and/or deliberate indifference.

368.   Not only have Plaintiffs and Class Members suffered and continue to suffer ongoing damages to their NIL rights, but they have also incurred, and will continue to incur, attorneys' fees and costs of litigation that they would not have incurred absent Defendants' misconduct.

369.    At the time of Defendants' misconduct, wrongful actions, and wrongful inactions, Plaintiffs and Class Members did not know that the University had failed to adequately protect them, including in its engagement, hiring, training, and supervision of Weiss.

370.    At the time of Defendants' misconduct, wrongful actions, and wrongful inactions, Plaintiffs and Class Members were unaware, and/or with reasonable diligence could not have been aware, of the vast scope of the University's institutional failings with respect to their responsibilities under Title IX.

371.    The University was aware of the highly sensitive nature of Plaintiffs' and Class Members' private and personal information to which Weiss was able to gain access due to his position.

372.    The University's policy and/or practice of deliberate indifference to the discrimination and sexual harassment of female athletes, including Plaintiffs and Class Members, created a heightened risk of sex-based discrimination, including cyber sexual harassment, sexual assault, privacy invasion and/or stalking. Because of the University's policy and/or practice of deliberate indifference, Plaintiffs had their privacy invaded and suffered cyber sexual harassment, sexual assault, stalking, and sex-based discrimination.

373.   Despite having the ability, the University failed to prevent the sex-based discrimination, sexual harassment, sexual assault, and/or stalking, suffered by Plaintiffs and Class Members.

374.   The University's conduct violates the mandates, words, content and intent of Title IX, as well as the Regulations and the Policy Interpretation promulgated therefrom.

375.   Plaintiffs and Class Members are entitled to injunctive relief, and as such specifically request it in the form of:

    a.  Ordering the University to disclose to Plaintiffs the details of (a) how it was learned that their personal, private information was accessed, (b) who learned that information, (c) when that information was learned, (d) what methods were used for that access, (e) what damage is believed to have occurred, (f) what damage it is believed will occur, and (g) why no other damages are likely in the eyes of the Defendants;

    b.  Disclosing details of (a) what security protocols are now being used, (b) why those protocols are now being used, (c) whether and how those protocols are consistent with industry standards, (d) what encryption protocols are being used, (e) regular audits, and (f) employee training, to prevent future data breaches that would impact Plaintiffs and Class Members; and

    c.  Ordering the University, the Regents, and Keffer, subject to a protective order, to immediately disclose the extent of their information gathered from their respective investigations into Weiss's actions so that Plaintiffs can determine what other protection or mitigating action they can take to reduce the harm.

81

376.   As a direct and/or proximate result of the University's deliberate indifference and intentional misconduct, Plaintiffs have been damaged and continue to suffer damages.

377.   Plaintiffs and Class Members should be awarded all available forms of damages and injunctive relief for the University's violations of Title IX.

378.   As a direct and foreseeable result of the University's deliberate indifference and intentional failure with regard to its obligations under Title IX, Plaintiffs and Class Members have suffered losses, including but not limited to:

a. Loss of educational opportunities and/or benefits;

b. Irreparable harm to their NIL rights, including but not limited to deterioration and diminution in value of their NIL rights;

c. Time and money spent on counseling;

d. Tuition monies, which should have funded reasonable data privacy protections but due to Weiss' actions did not;

e. Identity theft and/or increased risk of identity theft;

f. Fraudulent credit checks, charges, and/or spam due to identity theft and/or risk of identity theft;

g. Mitigation costs, including time and money spent to prevent and/or repair identity theft, such as on credit monitoring and software like DeleteMe; and

h. Attorneys' fees and costs.

## <u>COUNT II – VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a) *ET SEQ.*</u>
## <u>TREATMENT AND BENEFITS</u>
## <u>(AGAINST THE UNIVERSITY)</u>

379.   Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

380.   By its conduct, the University has, through the actions and/or inactions of its employees, agents, representatives, coaches, officials, and others, including named Individual University Employees and unnamed John Does, violated Title IX by knowingly, intentionally and deliberately discriminating against Plaintiffs and Class Members, by failing to provide them with treatment and benefits which are comparable overall to the treatment and benefits provided to male athletes.

381.   Defendant Weiss at the times relevant to this action was an employee of the University. Since Weiss targeted primarily women in his breach of highly sensitive PII, his misconduct constitutes discrimination against Plaintiffs and Class Members on the basis of sex.

382.   The University had the ability to prevent the discrimination that harmed Plaintiffs and Class Members, but it failed and/or refused to do so.

383.   The University maintained a policy and/or practice of deliberate indifference to the protection of female student athletes, including Plaintiffs and Class Members.

60453048.2

384.   The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the University's deliberate indifference toward the rights of the Plaintiffs and the Class Members.

385.   The University's failure to investigate and/or to respond promptly when Weiss' sexual harassment was reported to the University, and then conceal Weiss's conduct for years, constitutes deliberate indifference to discrimination on the basis of sex, in violation of Title IX.

386.   The University's conduct was intentional, as it acted with deliberate indifference to Plaintiffs' and Class Members' rights, both before and after Weiss' harassment, by:

   a. Failing to protect Plaintiffs and Class Members in accordance with Title IX requirements;

   b. Failing to adequately institute safeguards and protective measures to prevent Weiss from harassing students and invading their privacy;

   c. Failing to properly investigate the discriminatory sexual harassment perpetrated by Weiss;

   d. Failing to notify Plaintiffs and Class Members, and/or address complaints regarding the deeply private information Plaintiffs and Class Members entrusted to them;

   e. Failing to institute corrective measures to prevent Weiss from engaging in further sexual harassment of students; and

   f. Failing to adequately investigate additional acts of deliberate indifference.

84

387.   The University's failure to promptly and appropriately investigate, remedy, and respond to the discrimination of Plaintiffs and Class Members, and protect them and their PII, has effectively denied them equivalent educational opportunities at the University, specifically including medical and sports services, one of the Title IX treatment and benefit factors. 34 C.F.R. § 106.41(c).

388.   The Regulations explain how conduct such as that done by the University's employee and agent, Defendant Weiss, which was allowed by the University through action or inaction, can result in an effective denial of access to the University's education program: "[s]exual harassment means . . . [u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that **it effectively denies a person equal access to the recipient's education program or activity**. . ." 34 C.F.R. § 106.30(a) (2020) (emphasis added).

389.   The United States Supreme Court has adopted this approach, holding that a violation of Title IX is shown where a Plaintiff establishes "sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651.

85

390.   Such denied access need not be physical. "It is not necessary, however, to show physical exclusion to demonstrate that students have been deprived by the actions of another student or students of an educational opportunity on the basis of sex." *Davis,* 526 U.S. at 651 (1999).

391.   Weiss' conduct here, in collecting Plaintiffs' and Class Members' personal information, including their private information and photographs, and videos, was most certainly unwelcome.

392.   Weiss' unwelcome conduct, which on information and belief affected over 150,000 athletes, was so "severe, pervasive, and objectively offensive" (34 C.F.R. § 106.30(a) (2020)) that it effectively denied Plaintiffs and Class Members "equal access to the [University's] education program[s] or activit[ies]." *Id.* This includes medical and training services.

393.   At the time the Plaintiffs received medical and training services from the University, they did not know, and could not with reasonable diligence have known, of the University's institutional failings with respect to Title IX, including in its hiring, training, and supervision of Weiss.

394.   The University demonstrated its deliberate indifference, both before and after Weiss' sexual harassment, by failing and refusing to adequately train and supervise their employees, agents, and/or representatives, including Weiss, regarding the following duties:

86

60453048.2

a. Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

b. Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

c. Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d. Investigating any and all privacy invasions committed by Weiss;

e. Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f. Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g. Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

395.   The University's failure and refusal to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss's conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

396.   The actions and/or inactions of the University by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's conduct, led to the violations of Plaintiffs' and Class Members' rights.

397.   The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the University's deliberate indifference toward the rights of the Plaintiffs and Class Members.

87

398.    The United States Supreme Court has held that the failure to train itself can amount to deliberate indifference. *City of Canton, Ohio v. Harris* 489 U.S. 378, 388 (1989). As explained by the Davis Court, "the theory in *Gebser* was that the recipient is *directly* liable for its deliberate indifference to discrimination." *Davis,* 526 U.S. at 645 (emphasis supplied).

399.    The University's conduct violates the mandates, words, content and intent of Title IX, as well as the Regulations and the Policy Interpretation promulgated therefrom. Plaintiffs and Class Members are entitled to injunctive relief, and as such specifically request it in the form of:

   a.    Ordering the University to disclose to Plaintiffs the details of (a) how it was learned that their personal, private information was accessed, (b) who learned that information, (c) when that information was learned, (d) what methods were used for that access, (e) what damage is believed to have occurred, (f) what damage it is believed will occur, and (g) why no other damages are likely in the eyes of the Defendants;

   b.    Disclosing details of (a) what security protocols are now being used, (b) why those protocols are now being used, (c) whether and how those protocols are consistent with industry standards, (d) what encryption protocols are being used, (e) regular audits, and (f) employee training, to prevent future data breaches that would impact Plaintiffs and Class Members; and

   c.    Ordering the University, the Regents, and Keffer, subject to a protective order, to immediately disclose the extent of their information gathered from their respective investigations into Weiss's actions so that Plaintiffs can determine what other protection or mitigating action they can take to reduce the harm.

400.   As a direct and/or proximate result of the University's deliberate indifference and intentional misconduct, Plaintiffs have been damaged and continue to suffer damages.

401.   Plaintiffs and Class Members should be awarded all available forms of damages and injunctive relief for the University's violations of Title IX.

402.   As a direct and foreseeable result of the University's deliberate indifference and intentional failure with regard to its obligations under Title IX, Plaintiffs and Class Members have suffered losses, including but not limited to:

   a. Loss of educational opportunities and/or benefits;

   b. Irreparable harm to their name, image, and likeness ("NIL") rights, including but not limited to deterioration and diminution in value of their NIL rights;

   c. Time and money spent on counseling;

   d. Tuition monies, which should have included reasonable data privacy protections but due to Weiss' actions did not;

   e. Identity theft and/or increased risk of identity theft;

   f. Fraudulent credit checks, charges, and/or spam due to identity theft and/or risk of identity theft;

   g. Mitigation costs, including time and money spent to prevent and/or repair identity theft, such as on credit monitoring and software like DeleteMe;

   h. Attorneys' fees and costs.

60453048.2

## COUNT III – VIOLATION OF RIGHT TO PRIVACY AND APPROPRIATION UNDER MICHIGAN LAW (AGAINST THE INDIVIDUAL DEFENDANTS)

403. Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

404. As "Michigan has recognized a general right to publicity," NIL rights are a commercial asset protected under Michigan common law. *Romantics v Activision Pub, Inc*, 574 F. Supp. 2d. 758, 764 (E.D. Mich., 2008).

405. Michigan has recognized the inherent value of student-athletes' NIL, and to that end has passed an act "to prohibit postsecondary educational institutions in this state and certain athletic organizations from preventing a college athlete from receiving compensation for the use of his or her name, image, or likeness rights." MCL § 390.1731 *et seq.*

406. In Michigan, the common-law right of privacy is said to protect against four types of invasions of privacy.

    a. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

    b. Public disclosure of embarrassing private facts about the plaintiff.

    c. Publicity which places the plaintiff in a false light in the public eye.

    d. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

90

*Battaglieri v. Mackinac Ctr For Pub Policy*, 261 Mich. App. 296, 300 (2004) (emphasis omitted).

407.   Appropriation, also known as the "right of publicity," "differs from the first three types of the right to privacy; rather than the protection of a person's right 'to be left alone,' this right protects an individual's pecuniary interest in the commercial exploitation of his or her identity." *Id.* The Individual University Employees' actions violated Plaintiffs' and Class Members' right to privacy under invasion of privacy types 1, 2, and 4.

408.   On information and belief, Weiss used Plaintiffs' and Class Members' personal information, including their PII and private photographs, for personal and/or commercial use. Plaintiffs and Class Members were identifiable in the photographs as well as in their PII.

409.   Plaintiffs' and Class Members' information and private photographs were of a secret and private nature, which Plaintiffs and Class Members had a right to keep private. Weiss' use of this information and private photographs is highly offensive to the reasonable person.

410.   Plaintiffs and Class Members in no way consented to Weiss' use of their information, either for personal or commercial purposes.

411.   The private information of Plaintiffs and Class Members that Weiss collected, including PII and intimate photographs, is not a matter that is newsworthy or of legitimate public concern.

412.   Plaintiffs and Class Members, as high-level collegiate athletes, possess a legally recognized right to control and monetize their NIL rights, which are protected by Michigan NIL statutes and common law.

413.   Weiss's sexualized exploitation of Plaintiffs' and Class Members' private images – obtained without consent through cyber intrusion – directly impaired that right. Weiss's actions damaged the integrity, marketability, and future value of Plaintiffs' and Class Members' NIL assets. Any reputation damage, particularly when linked to nonconsensual exposure, directly reduces Plaintiffs' and Class Members' ability to control and profit from their NIL rights going forward.

414.   Furthermore, the Individual University Employees' actions and/or inactions wrongfully appropriated Plaintiffs' and Class Members' NIL rights in that their ability to leverage their NIL rights on their own terms has been undermined. By subjecting Plaintiffs and Class Members to nonconsensual access and potential exposure of sensitive photographs, the Individual Defendants irreparably tainted the public perception of Plaintiffs' and Class Members' personal brands. In today's collegiate sports environment, NIL value is inextricably linked to an athlete's public image, marketability, and perceived integrity. The reputational harm caused by

92

Weiss' conduct, combined with the Individual Defendants' deliberate indifference to cybersecurity risks and prior red flags, has materially diminished Plaintiffs' and Class Members' ability to obtain endorsements, sign with sponsors, obtain and/or retain employment or otherwise commercially benefit from their NIL rights and/or athletic status, particularly because of Plaintiffs' and Class Members' gender.

415.   Not only have Plaintiffs and Class Members suffered and continue to suffer damages due to the ongoing misuse of and/or ill effect on their NIL rights, but they have also incurred, and will continue to incur, attorneys' fees and costs of litigation that they would not have incurred absent the Individual Defendants' misconduct.

416.   Plaintiffs and Class Members have also suffered and continue to suffer severe emotional distress, including humiliation, embarrassment, loss of dignity and the profound sense of vulnerability that accompanies the exposure of deeply private matters.

417.   Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the

profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

## COUNT IV -- FOURTEENTH AMENDMENT
## DUE PROCESS – INVASION OF PRIVACY
## (AGAINST THE INDIVIDUAL UNIVERSITY EMPLOYEES)

418.   Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

419.   Under the Fourteenth Amendment, no state actor may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

416.   The Individual Defendants violated Plaintiffs' and Class Members' Due Process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

417.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law to deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourteenth Amendment right to Due Process. Defendant Weiss was a state employee acting under color of law at some times relevant to this action, and at other times was not a state employee acting under color of law.

94

418.   At the time of the conduct giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual Defendants that Plaintiffs and Class Members had an interest protected by the Due Process Clause of the Fourteenth Amendment, specifically their privacy, both personal and informational. The Individual Defendants knew or should have known that their actions and/or inactions violated that right.

419.   The Individual Defendants invaded Plaintiffs' and Class Members' privacy in violation of the Due Process Clause, through Weiss' access and sexualized exploitation of Plaintiffs' and Class Members' private images and PII, which were obtained without consent through cyber intrusion.

420.   Weiss's actions were malicious, intentionally harmful, and were taken with deliberate indifference, and were so outrageous as to shock the contemporary conscience.

421.   There is absolutely no public interest served by Plaintiffs' and Class Members' private information and photographs, nor any public need for invading Plaintiffs' and Class Members' privacy.

422.   The actions and/or inactions of Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring

95

Defendant Weiss's invasion of Plaintiffs' and Class Members' privacy, led to the violations of Plaintiffs' and Class Members' Due Process rights.

423. Defendant Wiess of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 knew or should have known about Weiss' invasion of privacy, sexual harassment, sexual assaults and/or stalking, and failed to act sufficiently to prevent them.

424. The Individual Defendants' actions were insufficient to protect Plaintiffs' and Class Members' right to privacy.

425. The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual Defendants' deliberate indifference toward the privacy rights and well-being of student-athletes.

426. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 failed to adequately train and/or supervise their employees, agents, and/or representatives, including Weiss, regarding the following duties:

a) Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

b) Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

96

c)      Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d)      Investigating any and all privacy invasions committed by Weiss;

e)      Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f)      Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g)      Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

427.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50's failing to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss' conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

428.   As a result, the Individual Defendants deprived Plaintiffs and Class Members of the clearly established constitutional right to privacy secured by the Fourteenth Amendment to the United States Constitution.

429.   The Individual Defendants are not entitled to qualified immunity.

430.   Section 1983 of Title 42 of the United States Code provides, in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

97

42 U.S.C. § 1983.

431. When the Individual Defendants engaged in the improper actions described above, they were acting under color of law for purposes of the Due Process Clause of the United States Constitution and 42 U.S.C. § 1983. Under this section, the Individual Defendants are liable for their violations of the Plaintiffs' and Class Members' constitutional rights under the Fourteenth Amendment.

432. The Individual Defendants' deprivation of Plaintiffs' and Class Members' right to privacy caused them to have suffered, and to continue to suffer, harm and damages as described above and further including but not limited to humiliation, distress, and embarrassment.

433. Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

## COUNT V -- FOURTEENTH AMENDMENT DUE PROCESS – DEPRIVATION OF PROPERTY (AGAINST THE INDIVIDUAL DEFENDANTS)

434.   Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

435.   Under the Fourteenth Amendment, no state actor may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

436.   The Individual Defendants violated Plaintiffs' and Class Members' Due Process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

437.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law to deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourteenth Amendment right to Due Process. Defendant Weiss was a state employee acting under color of law at some times relevant to this action, and at other times was not a state employee acting under color of law.

438.   At the time of the actions giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual

99

Defendants that that Plaintiffs and Class Members had an interest protected by the Due Process Clause of the Fourteenth Amendment, specifically the right not to be deprived of one's property. The Individual Defendants knew or should have known that their actions and/or inactions violated that right.

439.    The Individual Defendants engaged in actions which violated Plaintiffs' and Class Members' right to not be deprived of their property in violation of the Due Process Clause, through Weiss' access and sexualized exploitation of Plaintiffs' and Class Members' private images and PII, which were obtained without consent through cyber intrusion.

440.    Plaintiffs and Class Members had a protected property interest in their personal, private, intimate, and confidential information and photographs. This protected property interest was violated when Weiss took possession of Plaintiffs' and Class Members' PII and photographs.

441.    Plaintiffs and Class Members additionally had a protected property interest in their NIL rights. This protected property interest was violated when Weiss wrongfully appropriated Plaintiffs' and Class Members' NIL rights as described above.

442.    The actions and/or inactions of Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring

Defendant Weiss's deprivation of Plaintiffs' and Class Members' property, led to the violations of Plaintiffs' and Class Members' Due Process rights.

443.    Defendant Wiess of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 knew or should have known about Weiss' deprivation of property, sexual harassment, sexual assaults and/or stalking, and failed to act sufficiently to prevent them.

444.    The Individual Defendants' actions were insufficient to protect Plaintiffs' and Class Members' property rights.

445.    Weiss's actions were malicious, intentionally harmful, and were taken with deliberate indifference, and were so outrageous as to shock the contemporary conscience.

446.    The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual Defendants' deliberate indifference toward the property rights and well-being of student-athletes.

447.    Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 failed to adequately train and supervise their employees, agents, and/or representatives, including Weiss, regarding the following duties:

101

a)      Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

b)      Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

c)      Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d)      Investigating any and all privacy invasions committed by Weiss;

e)      Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f)      Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g)      Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

448.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50's failing to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss' conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

449.   Due to the highly personal nature of the Plaintiffs' and Class Members' information and photographs, along with the reputational and emotional harms they suffered and/or will suffer due to the Individual Defendants' actions and/or inactions, no adequate post-deprivation remedy exists.

102

450.   As a result, the Individual Defendants deprived Plaintiffs and Class Members of their clearly established constitutional property rights secured by the Fourteenth Amendment to the United States Constitution.

451.   The Individual Defendants are not entitled to qualified immunity.

452.   Section 1983 of Title 42 of the United States Code provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

42 U.S.C. § 1983.

453.   When the Individual Defendants engaged in the improper actions described above, they were acting under color of law for purposes of the Due Process Clause of the United States Constitution and 42 U.S.C. § 1983. Under this section, the Individual Defendants are liable for their violations of the Plaintiffs' and Class Members' constitutional rights under the Fourteenth Amendment.

454.   The Individual Defendants' deprivation of Plaintiffs' and Class Members' property rights caused them to have suffered, and to continue to suffer, harm and damages as described above and further including but not limited to humiliation, distress, and embarrassment.

103

455.    Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

## COUNT VI -- FOURTEENTH AMENDMENT -- DUE PROCESS – DEPRIVATION OF BODILY INTEGRITY (AGAINST THE INDIVIDUAL DEFENDANTS)

456.    Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

457.    Under the Fourteenth Amendment, no state actor may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

458.    The Individual Defendants violated Plaintiffs' and Class Members' Due Process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

459.    Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law to

deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourteenth Amendment right to Due Process. Defendant Weiss was a state employee acting under color of law at some times relevant to this action, and at other times was not a state employee acting under color of law.

460.   Among the historic liberties long cherished at common law is "a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security." *Ingraham v. Wright*, 430 U.S. 651, 673 (1977). This right, the "right to bodily integrity" is "a fundamental interest protected by the Due Process Clause of the Fourteenth Amendment." *In re Flint Water Cases*, 384 F. Supp. 3d 802, 839 (E.D. Mich. 2019), *aff'd and remanded*, 960 F.3d 303 (6th Cir. 2020).

461.   At the time of the actions giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual Defendants that Plaintiffs and Class Members had an interest protected by the Due Process Clause of the Fourteenth Amendment, specifically their right to bodily integrity. The Individual Defendants knew or should have known that their actions and/or inactions violated that right.

462.   The Individual Defendants engaged in actions which violated Plaintiffs' and Class Members' right to bodily integrity, in violation of the Due Process Clause, through Weiss' access and sexualized exploitation of Plaintiffs' and Class Members'

105

private images and PII, which were obtained without consent through cyber intrusion.

463.   Weiss's actions were malicious, intentionally harmful, and were taken with deliberate indifference, and were so outrageous as to shock the contemporary conscience.

464.   The actions and/or inactions of Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's deprivation of Plaintiffs' and Class Members' right to bodily integrity, led to the violations of Plaintiffs' and Class Members' Due Process rights.

465.   Defendant Wiess of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 knew or should have known about Weiss' deprivation of bodily integrity, sexual harassment, sexual assaults and/or stalking and failed to act sufficiently to prevent them.

466.   The Individual Defendants' actions were insufficient to protect Plaintiffs' and Class Members' right to bodily integrity.

467.   The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual Defendants' deliberate indifference toward

the right to bodily integrity and well-being of student-athletes and increased the likelihood of future sexual assaults.

468. Defendants Grasso, Ono, Schlissel, Manual, Gnodtke, Harbaugh, Pendse, Brennan and Does 10-50 failed to adequately train and supervise their employees, agents, and/or representatives, including Weiss, regarding the following duties:

a)    Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

b)    Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

c)    Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d)    Investigating any and all privacy invasions committed by Weiss;

e)    Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f)    Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g)    Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

469. Defendants Grasso, Ono, Schlissel, Manual, Gnodtke, Harbaugh, Pendse, Brennan and Does 10-50's failing to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss' conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

107

470.   As a result, the Individual Defendants deprived Plaintiffs and Class Members of their clearly established constitutional right to bodily integrity secured by the Fourteenth Amendment to the United States Constitution.

471.   The Individual Defendants are not entitled to qualified immunity.

472.   Section 1983 of Title 42 of the United States Code provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

42 U.S.C. § 1983.

473.   When the Individual Defendants engaged in the improper actions described above, they were acting under color of law for purposes of the Due Process Clause of the United States Constitution and 42 U.S.C. § 1983. Under this section, the Individual Defendants are liable for their violations of the Plaintiffs' and Class Members' constitutional rights under the Fourteenth Amendment.

474.   The Individual Defendants' deprivation of Plaintiffs' and Class Members' right to bodily integrity caused them to have suffered, and to continue to suffer, harm and damages as described above and further including but not limited to humiliation, distress, and embarrassment.

475.   Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

## COUNT VII -- FOURTEENTH AMENDMENT
## EQUAL PROTECTION
## (AGAINST THE INDIVIDUAL DEFENDANTS)

476.   Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

477.   The Fourteenth Amendment to the United States Constitution requires that a state shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.

478.   The Individual Defendants violated Plaintiffs' and Class Members' Equal Protection rights guaranteed by the Fourteenth Amendment to the United States Constitution.

479.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law to

deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourteenth Amendment right to Equal Protection. Defendant Weiss was a state employee acting under color of law at some times relevant to this action, and at other times was not a state employee acting under color of law.

480.   At the time of the actions giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual Defendants that Plaintiffs and Class Members had a right protected by the Equal Protection Clause of the Fourteenth Amendment, specifically the right to be free from gender discrimination, including sexual harassment and abuse at the hands of a state employee. The Individual Defendants knew or should have known that their actions and/or inactions violated that right.

481.   The Individual Defendants violated Plaintiffs' and Class Members' right to Equal Protection, through Weiss's access and sexualized exploitation of Plaintiffs' and Class Members' private images and PII, which were obtained without consent through cyber intrusion. This conduct constitutes sexual harassment, sexual assault and/or stalking, as defined in the Regulations.

482.   Plaintiffs and Class Members belong to a protected class, specifically based on gender as women. The violations of sexual harassment, sexual assaults

110

and/or stalking in this action are based on Plaintiffs' and Class Members' protected status.

483. The sexual harassment, sexual assaults and/or stalking were sufficiently severe and/or pervasive as to alter the conditions of Plaintiffs' and Class Members' education and create an abusive environment, such that it effectively denied Plaintiffs and Class Members equivalent access to the University's education programs and/or activities.

484. Defendant Wiess of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 knew or should have known about Weiss's Equal Protection violations, sexual harassment, sexual assaults and/or stalking and failed to act sufficiently to prevent them.

485. Plaintiffs and Class Members were treated differently from similarly situated individuals who were not members of the protected class, in that Weiss primarily targeted female athletes. Similarly situated male athletes were not subjected to the same sexual harassment, sexual assaults and/or stalking, as their female peers.

486. Weiss's actions were malicious, intentionally harmful, and were taken with deliberate indifference, and were so outrageous as to shock the contemporary conscience.

487.   The actions and/or inactions of Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 actions, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's illegal and discriminatory conduct as detailed above, led to the violations of Plaintiffs' and Class Members' Equal Protection rights.

488.   The Individual Defendants' actions were insufficient to protect Plaintiffs' and Class Members' rights to Equal Protection.

489.   The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual Defendants' deliberate indifference toward the rights and well-being of student-athletes.

490.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 failed to adequately train and supervise their employees, agents, and/or representatives, including Weiss, regarding the following duties:

a)     Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

b)     Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

c)     Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d)     Investigating any and all privacy invasions committed by Weiss;

112

e)      Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f)      Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g)      Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

491.    Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50's failing to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss' conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

492.    As a result, the Individual Defendants deprived Plaintiffs and Class Members of their clearly established constitutional right to be free from discrimination, secured by the Fourteenth Amendment to the United States Constitution.

493.    The Individual Defendants are not entitled to qualified immunity.

494.    Section 1983 of Title 42 of the United States Code provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

42 U.S.C. § 1983.

495.   When the Individual Defendants engaged in the improper actions described above, they were acting under color of law for purposes of the Equal Protection Clause of the United States Constitution and 42 U.S.C. § 1983. Under this section, the Individual Defendants are liable for their violations of the Plaintiffs' and Class Members' constitutional rights under the Fourteenth Amendment.

496.   The Individual Defendants' deprivation of Plaintiffs' and Class Members' right to Equal Protection caused them to have suffered, and to continue to suffer, harm and damages as described above and further including but not limited to humiliation, distress, and embarrassment.

497.   Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

## COUNT VIII -- FOURTH AMENDMENT -- UNREASONABLE SEARCH AND SEIZURE (AGAINST THE INDIVIDUAL DEFENDANTS)

498.   Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

114

499.   The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, provides in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. "This right applies with equal force in both the civil and criminal contexts." *Thomas v. Cohen*, 304 F.3d 563, 569 (6th Cir. 2002).

500.   The Individual Defendants violated Plaintiffs' and Class Members' rights guaranteed by the Fourth Amendment to the United States Constitution.

501.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law to deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourth Amendment right to be free of warrantless and unreasonable searches and seizures. The violation of this right is also, of course, an invasion of privacy. Defendant Weiss was a state employee acting under color of law at some times relevant to this action, and at other times was not a state employee acting under color of law.

502.   At the time of the actions giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual

115

Defendants that Plaintiffs and Class Members had an interest protected by the Fourth Amendment, specifically their Fourth Amendment right to be free of warrantless and unreasonable searches and seizures.

503.   The Individual Defendants violated Plaintiffs' and Class Members' right to be free of warrantless and unreasonable searches and seizures in violation of the Fourth Amendment through Weiss' access and sexualized exploitation of Plaintiffs' and Class Members' private images and PII, which were obtained without consent through cyber intrusion. The Individual Defendants knew or should have known that their actions and/or inactions violated that right.

504.   Weiss intentionally searched and seized Plaintiffs' private information without their consent, without a warrant, without probable cause or reasonable suspicion, and without any lawful basis or justification, in violation of Plaintiffs' and Class Members' clearly established rights under the Fourth Amendment. Defendant Weiss's search and seizure of Plaintiffs' and Class Members' personal information was per se unreasonable under the Fourth Amendment.

505.   Plaintiffs and Class Members had a reasonable and legitimate expectation of privacy in their private, personal, and intimate information and images.

506.   The search and/or seizure of Plaintiffs' and Class Members' information and photographs and videos was entirely unreasonable and caused

116

meaningful interference with their possessory interests in their property. For example, Plaintiffs and Class Members have possessory interests in their NIL rights. The Individual Defendants' actions caused irreparable damage to their NIL rights, thereby damaging their possessory interests.

507.   Weiss's actions were malicious, intentionally harmful, and were taken with deliberate indifference, and were so outrageous as to shock the contemporary conscience.

508.   The actions and/or inactions of Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 actions, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's illegal search and seizure, led to the violations of Plaintiffs' and Class Members' Fourth Amendment rights.

509.   The Individual Defendants' actions were insufficient to protect Plaintiffs' and Class Members' rights to be free of warrantless and unreasonable searches and seizures.

510.   The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual Defendants' deliberate indifference toward the rights and well-being of student-athletes.

511.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 failed to adequately train and supervise their

employees, agents, and/or representatives, including Weiss, regarding the following

duties:

    a)    Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

    b)    Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

    c)    Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

    d)    Investigating any and all privacy invasions committed by Weiss;

    e)    Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

    f)    Maintaining a campus environment free from sexual harassment and invasions of privacy; and

    g)    Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

512.    Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50's failing to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss' conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

513.    As a result, the Individual Defendants deprived Plaintiffs and Class Members of their clearly established constitutional rights secured by the Fourth Amendment to the United States Constitution.

514.   Defendant Wiess of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 knew or should have known about Weiss' Fourth Amendment violations, sexual harassment, sexual assaults and/or stalking and failed to act sufficiently to prevent it.

515.   The Individual Defendants are not entitled to qualified immunity.

516.   Section 1983 of Title 42 of the United States Code provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

42 U.S.C. § 1983.

517.   When the Individual Defendants engaged in the improper actions described above, they were acting under color of law for purposes of the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983. Under this section, the Individual Defendants are liable for their violations of the Plaintiffs' and Class Members' constitutional rights under the Fourth Amendment.

518.   The Individual Defendants' deprivation of Plaintiffs' and Class Members' Fourth Amendment rights caused them to have suffered, and to continue

119

to suffer, harm and damages as described above and further including but not limited to humiliation, distress, and embarrassment.

519.   Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

## COUNT IX – VIOLATION OF MICHIGAN CIVIL RIGHTS
## MICHIGAN CONSITUTION ARTICLE I -- § 26
## (AGAINST WEISS AND THE UNIVERSITY PARTIES)

520.   Plaintiffs adopt and re-allege all paragraphs as if fully set forth herein, with particular emphasis on the allegations made in the Title IX and § 1983 claims.

521.   Article I, Section 26 of the Michigan Constitution of 1963, in part, states: "The University of Michigan . . . shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education or public contracting."

522.   Plaintiffs are members of a protected class, specifically their gender as women.

523.   Defendant Weiss, while employed by the University and acting under color of state law, accessed, viewed, and/or retained private and sensitive images and digital data of Plaintiffs and Class Members, based solely on their sex.

524.   The Individual Defendants, who held supervisory and administrative roles within the University, had actual or constructive knowledge of Weiss's sex-based misconduct and failed to take appropriate remedial or preventative action.

525.   The actions and/or inactions of the University Parties, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's invasion of Plaintiffs' and Class Members' privacy, led to the violations of Plaintiffs' and Class Members' Michigan Constitutional rights.

526.   Defendants' actions and/or inactions subjected Plaintiffs to discrimination on the basis of sex. Plaintiffs faced both intentional discrimination and disparate treatment.

527.   Through Defendants' actions or inactions, Plaintiffs faced intentional discrimination. As Weiss targeted primarily women, this is discrimination motivated by Plaintiffs' sex as women.

528.   Through Defendants' actions or inactions, Plaintiffs also faced disparate treatment, as they were treated differently from similarly situated individuals of the opposite sex. Specifically, similarly situated men were not subjected to Weiss' actions nor the University Parties' actions and/or inactions.

121

Furthermore, as noted above the University Parties provided similarly situated men on the football team the benefit of Weiss's football prowess as an elite offensive coordinator at their playoff game, 10 days after his victimization of women was reported to the University. In contrast, the women continue to this day to be victimized.

529.   As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff has suffered and continues to suffer injuries, damages and losses as set forth herein.

## COUNT X – VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT ("ELCRA") MCL 37.2101 *ET SEQ.* SEXUAL HARASSMENT AND ASSAULT (AGAINST WEISS AND THE UNIVERSITY PARTIES)

530.   Plaintiffs adopt and re-allege all paragraphs as if fully set forth herein, with particular emphasis on the allegations made in the Title IX and § 1983 claims.

531.   The ELCRA provides Michigan citizens with:

The opportunity to obtain . . . the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, familial status, or marital status as prohibited by this act, is recognized and declared to be a civil right.

MCL 37.2102.

122

532.   At all material times, the University offered educational facilities, and/or is a political subdivision, covered by and within the meaning of the Michigan ELCRA, MCL 37.2101, *et seq*.

533.   The remaining Defendants are persons as that term is defined in ELCRA, MCL 37.2103.

534.   Plaintiffs are persons and students, or former students, at the University who faced discrimination on the basis of sex.

535.   Plaintiffs were and are members of a protected class by virtue of their sex as women.

536.   Under the ELCRA, "[d]iscrimination because of sex includes sexual harassment." MCL 37.2103(k). "Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions. . . . (iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment." *Id.*

537.   Due to Defendants' actions and/or inactions, Plaintiffs faced sexual harassment.

123

538.   The University's Standard Practice Guide 201.35 sets forth its policy

on discrimination:

> The University of Michigan. . . complies with all applicable federal and
> state laws regarding nondiscrimination. The University of Michigan is
> committed to a policy of equal opportunity for all persons and does not
> discriminate on the basis of race, color, national origin, age, marital
> status, sex, sexual orientation, gender identity, gender expression,
> disability, religion, height, weight, or veteran status in employment,
> educational programs and activities, and admissions.

539.   Defendant Weiss, while employed by the University and acting under

color of state law, accessed, viewed, and/or retained private and sensitive images and

digital data of Plaintiffs and Class Members, based solely on their sex.

540.   The Individual Defendants, who held supervisory and administrative

roles within the University, had actual or constructive knowledge of Weiss's sex-

based misconduct and failed to take appropriate remedial or preventative action.

541.   The actions and/or inactions of the University Parties, by failing to

adequately train and/or supervise, and/or by facilitating and/or enabling and/or

ignoring Defendant Weiss's invasion of Plaintiffs' and Class Members' privacy, led

to the violations of Plaintiffs' and Class Members' Michigan Constitutional rights

and in violation of the University's own policies.

542.   As Weiss targeted primarily women, Plaintiffs' sex and/or gender was

at least one factor that made a difference in Defendants' treatment of Plaintiffs and

subjected them to a hostile environment.

124

543.   Defendants, through their agents, representatives, and employees, including but not limited to the Individual Defendants, unlawfully discriminated against and harassed Plaintiffs based on their gender and/or sex and acted in accordance with that predisposition. Defendants treated Plaintiffs differently from similarly situated patrons in the administration of care based on their gender and/or sex, and allowed Plaintiffs to be subject to unlawful discrimination, including sexual harassment, sexual assault, privacy invasion, and/or stalking, based on their gender and/or sex.

544.   Defendant the University failed to provide adequate oversight, safeguards, or response procedures to prevent such sex-based discrimination, and failed to take prompt and effective remedial action once the conduct came to light.

545.   As a result, Plaintiffs were subjected to a hostile educational environment, discrimination based on sex, and a denial of equal access to educational benefits in violation of ELCRA.

546.   In addition, to the extent that Plaintiffs faced retaliation for raising concerns or participating in any investigation, such conduct independently violated ELCRA's prohibition on retaliatory discrimination. MCL 37.2701.

547.   Defendants' actions were intentional in disregard for Plaintiffs' rights and sensibilities.

125

60453048.2

548.   As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiffs have suffered and continue to suffer injuries, damages and losses as set forth herein.

## COUNT XI – VIOLATION OF MICHIGAN CONSTITUTION ARTICLE 1, § 2 FOR EQUAL PROTECTION (AGAINST WEISS AND THE UNIVERSITY PARTIES)

549.   Plaintiffs adopt and re-allege all paragraphs as if fully set forth herein, with particular emphasis on the allegations made in the Title IX and § 1983 claims.

550.   The Michigan Constitution states: "[n]o person shall be denied the equal protection of the laws…". MI Const. Art. 1, § 2. The Michigan Constitution, Article 1, § 2 guarantees equal protection and protection against discrimination.

551.   "The Michigan Constitution secures the same right of equal protection (Const.1963, art. 1, § 2) and due process (Const.1963, art. 1, § 17) as does the United States Constitution." *Roy v. Rau Tavern, Inc*, 167 Mich. App. 664, 667 (1988).

552.   Defendants were acting under color of state law at all times relevant to this action.

553.   Plaintiffs, persons and students, or former students, at the University, and entitled to the equal protection of the law in connection with her education and access to institutional resources.

554.  Defendant Weiss, while acting under color of law and within the scope of his employment at the University, targeted Plaintiffs and other female student-athletes by accessing and misappropriating their private digital materials solely because of their sex.

555. The Individual Defendants, acting in their official roles within the University, knew or should have known of this sex-based conduct and either enabled it, failed to prevent it, or deliberately disregarded it.

556. Defendant University of Michigan failed to provide a nondiscriminatory educational environment and took no prompt or effective remedial action despite knowledge of discriminatory conduct, thereby violating Plaintiffs' right to equal protection under Michigan law.

557. The conduct of all University Parties, individually and collectively, resulted in Plaintiffs being treated unequally on the basis of sex by a state actor, in violation of their rights under Article I, § 2 of the Michigan Constitution.

558.  Plaintiffs and Class Members are entitled to monetary damages, as no adequate alternative remedy exists.

559.  There was no rational basis for the disparate treatment.

560.  Governmental immunity does not shield officials from liability when they violate clearly established constitutional rights of which a reasonable person would have known. Defendants' actions violated Plaintiffs' rights to equal

127

protection, which is a right clearly established under the Michigan constitution and which a reasonable person would have known.

561. The above-described acts of abuse and inferior treatment is not substantially related to an important and legitimate government interest and violates Plaintiff's rights to equal protection under the Michigan Constitution.

562. Defendants' actions were intentional in disregard for Plaintiff's rights and sensibilities.

563. As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiffs have suffered and continues to suffer injuries, damages and losses as set forth herein.

564. All of Defendants' collective and singular conduct was willful, malicious, knowingly, intentionally and/or with reckless disregard of the consequences of their actions. Accordingly, Plaintiffs are entitled to an award of punitive damages.

## COUNT XII – VIOLATION OF THE RIGHT TO SUBSTANTIVE DUE PROCESS UNDER THE MICHIGAN CONSTITUTION (AGAINST WEISS AND THE UNIVERSITY)

565. Plaintiffs reallege the preceding paragraphs as if fully repeated.

128

566.   Article 1, § 17 of the Michigan Constitution provides, in pertinent part, that "[n]o person shall be…deprived of life, liberty or property, without due process of law."

567.   The Due Process Clause of the Michigan Constitution protects citizens from the deprivation of certain fundamental rights, regardless of the process afforded.

568.   The right to privacy and the right to bodily integrity are fundamental rights protected under the Due Process Clause of the Michigan Constitution.

569.   The due process guarantee of the Michigan Constitution is coextensive with its federal counterpart. The doctrine of substantive due process protects enumerated fundamental rights and liberties under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and under CONST. 1963, ART. 1 § 17.

570.   Plaintiffs, along with all members of the Class, were protected by the right to not be deprived of life, liberty or property without due process of law under the Due Process Clause of the Michigan Constitution.

571.   The right to privacy and bodily integrity has long been recognized by the Michigan Supreme Court to be protected by the Due Process Clause of the Michigan Constitution, CONST. 1963, ART. 1, § 17. *Mays et al. v Governor of Michigan et al.*, 506 Mich. 157, 186-187 (2020).

129

572.   Weiss, as a University employee at all times relevant and acting within the scope of his employment, violated the rights of Plaintiffs and Class Members by improperly accessing their PII and PHI and using that information to gain unauthorized access to other computer systems, which Weiss used to access private and intimate information belonging to Plaintiffs and Class Members, causing substantial damages to Plaintiffs and Class Members.

573.   The arbitrary and capricious conduct of Defendants, including Weiss, which deprived Plaintiffs and other Class Members of their privacy and bodily integrity was so egregious as to "shock the conscience" of any fair-minded person. *Mays*, at 192 (citing *Mettler Walloon, L.L.C. v. Melrose Twp.*, 281 Mich. App. 184, 198, 761 N.W.2d 293 (2008) (explaining that in the context of individual governmental actions or actors, to establish a substantive due-process violation, "the governmental conduct must be so arbitrary and capricious as to shock the conscience")).

574.   At all relevant times, Weiss was acting as an employee of the University, a public university funded by the State of Michigan, including, but not limited to, being responsible for the health, safety, and well-being of its students.

575.   As his employer, the University is vicariously liable for Weiss's actions.

576.   The University also violated the rights of Plaintiffs and Class Members by depriving them of their right to privacy and bodily integrity without due process

130

by improperly disclosing PII and PHI belonging to Plaintiffs and Class Members to Weiss, causing substantial damages to Plaintiffs and Class Members.

577.   Weiss's conduct in improperly accessing PII and PHI belonging to Plaintiffs and Class Members and using that information to access private information and photographs belonging to Plaintiffs and Class Members was arbitrary and capricious and so egregious as to shock the conscience.

578.   The conduct of the University, in recklessly permitting unauthorized access to the PII and PHI of Plaintiffs and Class Members, thereby permitting their most personal and intimate information to be stolen by a University employee, was arbitrary and capricious and so egregious as to shock the conscience.

## COUNT XIII – VIOLATION OF THE RIGHT TO PROCEDURAL DUE PROCESS UNDER THE MICHIGAN CONSTITUTION (AGAINST WEISS AND THE UNIVERSITY)

579.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

580.   Article 1, § 17 of the Michigan Constitution provides, in pertinent part, that "[n]o person shall be…deprived of life, liberty or property, without due process of law."

581.   Plaintiffs and Class Members were protected by the right to not be deprived of life, liberty or property without due process under the Due Process Clause of the Michigan Constitution.

131

582.   The right to privacy and the right to bodily integrity are protected under the Due Process Clause of the Michigan Constitution.

583.   Weiss, as a University employee at all times relevant and acting within the scope of his employment, violated the rights of Plaintiffs and Class Members by improperly accessing their PII and PHI without due process and using that information to gain unauthorized access to other computer systems, which Weiss used to access private information and photographs belonging to Plaintiffs and Class Members, causing substantial damages to Plaintiffs and Class Members.

584.   As his employer, the University is vicariously liable for Weiss's actions.

585.   The University also violated the rights of Plaintiffs and Class Members by depriving them of their right to privacy and bodily integrity without due process by improperly disclosing PII and PHI belonging to Plaintiffs and Class Members to Weiss, causing substantial damages to Plaintiffs and Class Members.

## COUNT XIV – UNLAWFUL SEARCH AND SEIZURE UNDER THE MICHIGAN CONSTUTION (AGAINST WEISS AND THE UNIVERSITY)

586.   Plaintiffs reallege the preceding paragraphs as if fully repeated.

587.   Article 1, § 11 of the Michigan Constitution provides in pertinent part, that "The person, houses, papers, possessions, electronic data, and electronic communications of every person shall be secure from unreasonable searches and seizures."

132

588.   Weiss, as a University employee at all times relevant and acting within the scope of his employment, violated the rights of Plaintiffs and Class Members by improperly accessing their PII and PHI and using that information to gain unauthorized access to other computer systems, which Weiss used to access private and intimate information belonging to Plaintiffs and Class Members.

589.   As his employer, the University is vicariously liable for Weiss's actions.

590.   Weiss's actions constituted a search and seizure of electronic data and electronic communications belonging to Plaintiffs and Class Members.

591.   Weiss did not seek or obtain a warrant, and did not have any other lawful authorization or justification that would have permitted him to search or seize electronic data and electronic communications belonging to Plaintiffs and Class Members.

592.   Plaintiffs and Class Members have a reasonable expectation of privacy in their personal electronic data and electronic communications.

593.   Weiss's search and seizure of electronic data and electronic communications belonging to Plaintiffs and Class Members was therefore per se unreasonable.

594.   Weiss's search and seizure of electronic data and electronic communications belonging to Plaintiffs and Class Members caused substantial damages to Plaintiffs and Class Members.

133

## <u>COUNT XV – STATE-CREATED DANGER UNDER THE MICHIGAN CONSTITUTION (AGAINST THE UNIVERSITY)</u>

595.    Plaintiffs reallege the preceding paragraphs as if fully repeated.

596.    Article 1, § 17 of the Michigan Constitution provides, in pertinent part, that "[n]o person shall be…deprived of life, liberty or property, without due process of law."

597.    The University recklessly exposed Plaintiffs and Class Members to a dangerous predator, Weiss, knowing he could cause serious damage by sexually harassing female students, and also by violating their rights to privacy.

598.    Plaintiffs, as female student athletes, were foreseeable victims.

599.    The invasion of Plaintiffs' and Class Members' privacy by Weiss was foreseeable.

600.    The decisions and actions to expose Plaintiffs PII and PHI to Weiss constituted affirmative acts that caused and/or increased the risk of harm, as well as physical and emotional injury, to Plaintiffs and Class Members.

601.    The risk that the University created regarding Plaintiffs and Class Members was different from a risk that affects the public, because Plaintiffs, as University athletes, were required to entrust the University with their PII and PHI.

134

602. The University knew, or should have known, that its collection of PII and PHI and exposure of that information to Weiss endangered Plaintiffs and Class Members.

603. Plaintiffs should be awarded all such forms of damages in this case for the University's conduct that caused great damage, humiliation, and embarrassment to Plaintiffs and the Class.

## COUNT XVI -- VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT – 18 U.S.C. § 1030 (AGAINST WEISS, KEFFER, THE REGENTS, THE UNIVERSITY, AND INDIVIDUAL DEFENDANTS)

559. Plaintiffs incorporate all other paragraphs of this Complaint by reference as if fully repeated.

560. A person violates the Computer Fraud and Abuse Act ("CFAA") if they intentionally access a protected computer, lacked authority to access the computer or exceeded granted authority to access the computer, and thereby obtain information from any protected computer. *See* 18 U.S.C. § 1030(a)(2)(C). A "protected computer" includes one that is used in or affecting interstate or foreign commerce. 18 U.S.C.§ 1030(e)(2).

561. Further, a person violates the Act by knowingly accessing or causing the transmission of a program, information, code, or command, and as a result of such conduct, intentionally or recklessly causes damage without authorization to a protected computer. *See* 18 U.S.C. § 1030(a)(5)(A), (B).

135

562.   Employers, supervisors, and others in a position of power or control are liable for violations of the Act under common-law tort doctrines, including agency and *respondeat superior*.

563.   Weiss used his University-granted access to Keffer's systems to intentionally obtain sensitive data about class members from Keffer's ATS without authorization. Weiss's obtained access to Keffer's system as part of and by virtue of his employment as a football coach at the University.

564.   Keffer was aware of Weiss's elevated level of access to its systems and that he was accessing and taking extraordinarily sensitive data but failed to terminate Weiss's access or otherwise stop him from exfiltrating data without authorization.

565.   Weiss gained access to class members' University's Google Workplace system, including Google Drive, without authorization in furtherance of his duties as a senior coach employed in the University's Athletic Department.

566.   Weiss had, guessed, and/or changed class members' passwords using the data he had gained by virtue of his employment by the University. Weiss used that access to view and/or download explicit and/or intimate videos and photos of class members without their authorization.

567.   Keffer's ATS and the University's Google Workplace systems, and the servers and computers that support them, are "protected computers" under the Act.

136

568.   Class Members' computers, which Weiss accessed, are likewise "protected computers" under the Act.

569.   Weiss intentionally accessed protected computers, lacked authority to access the computers or exceeded granted authority to access the computers, and thereby obtained information from any protected computer.

570.   The University, through the Regents, and Individual Defendants are vicariously liable for Weiss's intentional acts.

571.   Keffer knowingly and recklessly allowed Weiss to exfiltrate data from its ATS servers.

572.   Under 18 U.S.C. § 1030(g), the class may recover damages in this civil action from each of the Defendants, as well as injunctive relief.

## COUNT XVII -- VIOLATION OF THE STORED COMMUNICATIONS ACT – 18 U.S.C. § 2701 *ET SEQ.* (AGAINST WEISS, KEFFER, THE REGENTS, THE UNIVERSITY, AND INDIVIDUAL DEFENDANTS)

573.   Plaintiffs incorporate all other paragraphs of this Complaint by reference with the same force and effect as if fully repeated.

574.   A person violates the Stored Communications Act when he intentionally accesses without authorization a facility through which an electronic communication service is provided or intentionally exceeds an authorization to access that facility and thereby obtains, alters, or prevents authorized access to a wire

137

or electronic communication while it is in electronic storage in such system. *See* 18 U.S.C. § 2701(a).

575.   Electronic storage includes any temporary, immediate storage of a wire or electronic communication incidental to electronic transmission and any storage of an electronic communication by an electronic communication service. *See* 18 U.S.C. § 2510(17). An electronic communication includes, with few exceptions, any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature by a wire or radio that affects interstate or foreign commerce. *Id.* § 2510(12).

576.   Employers, supervisors, and others in a position of power or control are liable for violations of the Act under common-law tort doctrines, including agency and *respondeat superior*.

577.   The Act imposes strict liability on defendants.

578.   Weiss used his University-granted access to Keffer's systems to intentionally obtain sensitive data about class members from Keffer's ATS without authorization. Weiss obtained access to Keffer's system as part of and by virtue of his employment as a football coach at the University. Absent that employer-granted access, Weiss would have been unable to violate the Act.

579.   Weiss gained access to class members' University's Google Workplace system, including Google Drive, without authorization in furtherance of his duties as a senior coach employed in the University's Athletic Department.

580.   Weiss had, guessed, and/or changed class members' passwords using the data he had gained by virtue of his employment by the University. Weiss used that access to view and/or download explicit and/or intimate messages, mails, videos, and photos of class members without their authorization.

581.   Keffer's ATS and the University's Google Workplace systems, and the servers and computers that support them, are facilities through which an electronic communication services are provided.

582.   Weiss intentionally accessed ATS and the University's Google Workplace systems, lacked authority to access these systems or exceeded granted authority to access these systems, and thereby obtained unauthorized access to class members' electronic wires and/or communications.

583.   The University, through the Regents, Keffer, and Individual Defendants are vicariously liable for Weiss's intentional acts.

584.   The class may bring a civil action for violation of the Act, and they may obtain appropriate relief including equitable and declaratory relief, actual damages or damages not less than $1,000, punitive damages, and reasonable attorneys' fees and costs. *See* 18 U.S.C. § 2707(b)-(c).

## COUNT XVIII – RECKLESSNESS (AGAINST ALL DEFENDANTS)

585.   Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

139

586.   Plaintiffs entrusted the Regents, the University, and Keffer with her private information, social media, images, and videos.

587.   Plaintiffs were reasonable with that entrustment under the circumstances because the Regents, the University, and Keffer are in positions of control over Plaintiffs' PII, PHI, and NIL in the undergraduate student athlete context.

588.   Plaintiffs' entrustment to the Regents, the University, and Keffer extended to the safeguarding of their private information, social media, images, and videos.

589.   The Regents, the University, and Keffer are liable at law to Plaintiffs and the Class if they permit the handling and use of Plaintiffs' private personal information and the private and personal information of the Class to be held and handled in a manner that will cause harm to the Plaintiffs, the Class Members, or others.

590.   The Regents, the University, and Keffer knew of the sensitivity of the information they were handling, and Plaintiffs relied heavily on the Regents, the University, and Keffer for the safe handling and using of the information entrusted to them.

591.   The Regents, Keffer, and the University each acted recklessly by not taking even the most basic steps to handle and care for the personal and private

140

information of the Plaintiffs and the Class, by, among other conduct as identified in this Complaint, failing to use MFA, permitting actors like Weiss to access personal information without background checks, and failing to monitor the quantities of information and extent of access by individuals such as Weiss.

592. As further illustration, Keffer, presumably jokingly, included until recently a picture of its pet dog on its website as its public indication of who is in charge of "security" as it relates to Keffer's team:

## Meet the Team



**Ashley, ATC**
Sales & Support



**Joe, ATC**
Sales & Support



**Gail**
Research & Sales



**Dana**
Office Manager



**Rhett**
Founder/CEO



**Maggie**
Office Security

593. But Plaintiffs' and the Class Members' PII, PHI, NIL, and other sensitive and private information is not a joking matter.

141

60453048.2

594.   But for the lax below-standard security measures and failures by the Regents, the University, and Keffer, Plaintiffs' and the Class Members' PII, PHI, NIL, and other private information, social media, images, and email accounts would not have been accessed by Weiss, and likely others.

595.   The Regents failed in its duty.

596.   The University failed in its duty.

597.   Keffer failed in its duty, even after Weiss's activities were reported in December 2022.

598.   The Individual Defendants also acted recklessly by failing to review or even consider how to safeguard Plaintiffs' and the Class Members' PII, PHI, NIL, and other personal information, social media, images, and email accounts.

599.   The Individual Defendants failed to undertake any action whatsoever to review or consider the maintenance, protection, monitoring, and supervision of Plaintiffs' personal and private information entrusted to Keffer and to the University to ensure it was kept confidential and safe.

600.   But for the Individual Defendants' gross negligence and recklessness in this respect, Plaintiffs and the Class members would not have been damaged.

601.   Plaintiffs have incurred significant monetary and nonmonetary damages as a result of Defendants' actions and request the appropriate damages.

## COUNT XIX – TRESPASS TO CHATTELS
## (AGAINST THE UNIVERSITY AND WEISS)

602.   Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

603.   By accessing Plaintiffs' personal and private information without authorization, Weiss and the University intentionally and harmfully interfered with, and wrongfully exercised dominion or control over, Plaintiffs' private and personal information, images, videos, and social media.

604.   The aforementioned accessing, dominion, and control was willful and malicious.

605.   Plaintiffs and the Class Members have incurred significant monetary and nonmonetary damages as a result of Weiss's and the University's intentional and harmful interference with, and wrongful exercise of dominion or control over, Plaintiffs' private and personal information.

606.   Plaintiffs are entitled to exemplary damages as a result of these intentional and harmful act and interference with, and wrongful exercise of control over, their property.

## COUNT XX – COMMON LAW CONVERSION
## (AGAINST THE UNIVERSITY AND WEISS)

607.   Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

143

60453048.2

608.   By accessing Plaintiffs' personal and private information, Weiss and the University wrongfully exercised dominion or control over Plaintiffs' property, social media, images, videos, and related media, and that access was in denial of, or inconsistent with, Plaintiffs' rights therein.

609.   The aforementioned exercise of dominion or control was willful and malicious.

610.   Plaintiffs have incurred significant monetary and nonmonetary damages as a result of these Defendants wrongfully exercising dominion or control over Plaintiffs' personal and private information all of which was in denial of, or inconsistent with, Plaintiffs' rights therein.

611.   Plaintiffs are entitled to exemplary damages as a result of these Weiss and the University wrongfully exercising dominion or control over Plaintiffs' property, in denial of, or inconsistent with, Plaintiffs' rights therein.

## COUNT XXI – VIOLATIONS OF MCL § 600.2919a
## (AGAINST THE UNIVERSITY AND WEISS)

612.   Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

613.   MCL § 600.2919a provides:

60453048.2

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

(b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

614.   Plaintiffs were damaged as a result of the University and Weiss possessing, concealing, aiding the concealment of, stealing, and/or embezzling Plaintiffs' private and personal information and converting that information, those videos, and those images to those Defendants' own use by using that information for their own purposes.

615.   Under MCL § 600.2919a, Plaintiffs are entitled to 3 times actual damages, plus costs and reasonable attorney fees.

145

## COUNT XXII – VIOLATION OF MICHIGAN IDENTITY THEFT PROTECTION ACT – MCL 445.61 et. seq. (Against Defendants Weiss and Keffer)

616.    Plaintiffs restate and incorporate the allegations set forth above as if fully repeated.

617.    Plaintiffs allege Defendants Weiss and Keffer violated the Michigan Identity Theft Protection Act.

618.    Plaintiffs' and Class Members' personal and private media, content, data, and information were stored electronically and intended to be kept private.

619.    Defendant Weiss unlawfully accessed this private and personal information, data, and media.

620.    Defendant Weiss' actions were not authorized.

621.    Defendant Keffer maintained a database of Plaintiffs' and Class Members' sensitive, personal information and protected health information.

622.    Defendant Keffer had a duty to notify Plaintiffs and Class Members of the unauthorized breach of their very private data.

623.    Defendants failed to notify Plaintiffs and Class Members of such.

624.    As a result, Plaintiffs and Class Members were unaware for years that their very sensitive data was being accessed without their permission or authorization in violation of Michigan's Identity Theft Protection Act.

146

625.   As a result of Defendants' conduct, Plaintiffs and Class Members suffered significant and severe damages and as such Plaintiffs seek compensation as appropriate for these damages.

## XXIII – NEGLIGENCE AS TO KEFFER

626.   Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

627.   Keffer owed Plaintiffs and the Class a duty to reasonably protect and safeguard their PII, PHI, NIL, and to limit access to private information, social media, images, and videos.

628.   Keefer acted unreasonably by use and maintenance of its dated, open, and unsecure ATS system.

629.   As a result, Weiss was able to access Plaintiffs' and the Class's PII, PHI, NIL, and other private information, social media, images, and videos.

630.   It was a breach of a reasonable standard for Keffer to not more carefully handle and use the personal and private information of the Plaintiffs, including with greater attention, and sensitivity so as to safeguard and protect from instruction by Weiss.

631.   Keffer failed in that duty.

632.   Plaintiffs' information was accessed by Weiss as a result.

633. Plaintiffs have incurred significant monetary and nonmonetary damages as a result of Defendants' actions and request the appropriate damages.

WHEREFORE, Plaintiffs request that the Court enter a judgment encompassing the relief requested above, plus significant compensatory damages exceeding $500,000,000.00 together with all other forms of relief, costs, interest and attorney fees, against Defendants, jointly and severally, and such other relief to which Plaintiffs and the Class Members are entitled.

Date: June 27, 2025                        Respectfully Submitted,

By:/s/*Parker Stinar*
Parker Stinar
parker@sgghlaw.com

By:/s/*Patrick Lannen*
Patrick Lannen
Erik Johnson
**STINAR GOULD GRIECO &
HENSLEY, PLLC**
550W. Merrill Street, Suite 249
Birmingham, Michigan 48009
patrick@sgghlaw.com
(269) 370-1746
erik@sgghlaw.com
(248) 221-8561

By:/s/ *Brian Glasser*
Brian A. Glasser
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street,
NW, Suite 540
Washington, DC 20007
Phone: (202) 463-2101

148

bglasser@baileyglasser.com

By: */s/ Bart Cohen*
Bart D. Cohen
**BAILEY & GLASSER LLP**
1622 Locust Street
Philadelphia, PA 19103
Phone: (267) 973-4855
bcohen@baileyglasser.com

By: */s/ David Selby, II*
David L. Selby, II *(admission pending)*
**BAILEY & GLASSER LLP**
3000 Riverchase Galleria, Suite 905
Birmingham AL 35244
Phone: (205) 628-7575
dselby@baileyglasser.com

By: */s/ John W. Barrett*
John W. Barrett
Katherine E. Charonko
**BAILEY & GLASSER LLP**
209 Capitol Street
Charleston, WV 25301
Phone: (304) 345-6555
jbarrett@baileyglasser.com
kcharonko@baileyglasser.com
*Counsel for Plaintiffs*

By: */s/ Aimee H. Wagstaff*
Aimee H. Wagstaff
Benjamin Gillig
**WAGSTAFF LAW FIRM**
940 N. Lincoln Street
Denver, CO 80203
Tel: 303-376-6360
awagstaff@wagstafflawfirm.com
bgillig@wagstafflawfirm.com

149

By: */s/ Nathan Fink*
Nathan J. Fink
**FINK BRESSACK PLLC**
38500 Woodward Avenue, Ste 350
Bloomfield Hills, MI 48304
248-971-2500
nfink@finkbressack.com

By: */s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV
Emily Schiller
**STRANCH, JENNINGS & GARVEY,
PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
gstranch@stranchlaw.com
eschiller@stranchlaw.com

By: */s/ Raina Borrelli*
Raina Borrelli
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
raina@straussborrelli.com

By: */s/  Gary M. Klinger*
Gary M. Klinger
**MILBERG**
221 W. Monroe Street, Suite 2100
Chicago, IL 60606
gklinger@milberg.com

By: */s/  James J. Pizzirusso*
James J. Pizzirusso
**HAUSFELD LLP**
1200 17th St NW Suite 600,
Washington, DC 20036
T: 202.540.7200

150

jpizzirusso@hausfeld.com

*Counsel for Plaintiffs and the Proposed Class*

151